I, Ira L. Scherr, being duly sworn do hereby affirm and state the following facts based upon my personal knowledge and experiences, and where based upon information and belief, I believe them to be true and state:

    1. I was employed at the Maine State Prison in Warren, Maine as a correctional officer for almost five years.

    2 I was a union member and held the positions of Steward, Chief Steward, Unit Chair, Vice-President and President of AFSCME local 2968.

    3 As a result of my position as a union representative I met frequently in union negotiated labor management meetings with all levels of administration of the DOC up to and including the Commissioner of the Department of Corrections.

    4. On February 25, 2008, under whistleblower protection I appeared before the Maine State joint standing committee on Criminal Justice Chaired by Senator Ethan Strimling and enumerated many violations of accepted labor practices including discrimination, retaliation and alleged violations of various state laws and codes performed at the Maine State Prison.

    5. I explained that there was a corporate culture that had endured at the Department of Corrections for many years, that encouraged and supported retaliation and fear and intimidation as usual labor practices on a daily basis.

    6. If an officer complained about working conditions or supervisors it was common for that officer to have daily harassment including excessive video surveillance which is considered a retaliatory act under accepted labor practices. Insults, discriminatory statements, write-ups, ignoring of complaints, capricious orders, lack of due process or just cause in both supervisory and disciplinary situations; denial of constitutionally guaranteed civil and labor rights and protections, creation of 'paper trails' based on false statements leading to terminations and in general false charges and threats to deprive expected fair treatment were de rigueur.

    7. This corporate culture used a system of nepotism and favoritism, two things that are anathema to accepted labor practices, which were commonly referred to as the 'kid system'. An investigation of the labor practices by the Office of Program Evaluation and Government Accountability (OPEGA) a subdivision of the state's Oversight Committee, confirmed this upon completion of their investigation of wrongdoing at the Maine State Prison. It was common for sons of supervisors to be hired and get favoritism for promotion. This went on for years, sons of wardens, sons of captains, wives of supervisors all were regularly promoted, even bypassing the usually required testing by keeping the process secret.

    8. It was more frequent than rare for there to be a captain with a son or brother, a sergeant with a son or brother working at the prison and receiving favorable treatment. While I was there Deputy Warden O'Farrell's son was an officer who was regularly seen to be slovenly, lazy and incompetent, he left the prison's employ for a few months and upon returning was almost immediately promoted to sergeant, not in keeping with accepted waiting periods before promotions. Sergeant Abbot had a son who was a prison guard, who has since left for bad behavior, and he married another officer who received special treatment, as well as a son-in-law who also worked at the prison. Captain Black had a brother there who became a sergeant. The system was rife with both special treatment and promotions.

9. Examples of special treatment at the prison consisted of lack of prosecution for crimes and misdemeanors, cover-ups and outright destruction of documents. Deputy warden O'Farrell was reputed to have been driving a motorcycle while drunk and without a valid motorcycle license and having an accident in front of the Bolduc Facility, yet was not even summonsed for this. I was told this by an eyewitness to the event.

10. James O'Farrell jr was promoted at the prison in keeping with this practice. Many supervisors, normally complacent with this system were appalled to see this happen. One sergeant complained to me that a week after supposedly taking the test, Sargent O'Farrell could not answer the most basic required knowledge questions for a sergeant, yet purportedly got the first 100% perfect score on his boards.

11. I have seen documentation that during Sgt O'Farrell's boards that his father, the Deputy Warden, brought hot chocolate into the room the boards were being held in, for the benefit of the testers. This would be considered disqualifying by normal labor practices as interfering and intimidating to even enter the room during this process. And under normal circumstances seen as serious undue influence.

12. As an officer, and as a union officer, I was frequently advised and complained to by victims of harassment, sexual and otherwise that went on regularly at the prison. Sometimes the complaints were looked into, most often not. Most women do not stay long at the prison. I know of many female officers that were driven out of the prison. Sexual activity between supervisor and supervised is considered a prohibited labor practice akin to rape, yet this too was rampant , both in and out of the facility during my tenure. I did not personally witness these activities, but had them reported to me numerous times.

13. I know for a fact that officer Pamela Sampson has filed a complaint in court, Sgt. Brown filed for harassment, Officer Dawson filed. It was a common practice for management at the prison to advise all officers if they had a complaint that they could not sue unless they first went to the union, then called the Human rights commission or Kathy Lincoln who is charged with protecting these rights. In my experience, after a number of calls, Kathy Lincoln, didn't return the call, nor did I get any satisfaction with the attorney general's office, the district attorney, the state police or the federal attorney's office. I was the president of the union and could not even get anybody to listen to my complaints, how could a lone officer expect help.

14. I was aware of several complaints of sexual harassment made against Sargeant James E. O'Farrell during his tenure at the Maine State Prison, but I never heard of any satisfaction received by the complainants. As the Unit Chair, I should have been made aware of any disciplinary actions regarding Sgt. O'Farrell as our union also represented him. I assumed all were quashed by his father. I have learned of numerous cash settlements to people by the state to settle these types of complaints. I have been told that if the state knew how much Deputy Warden O'Farrell has cost the state in settlement money over the years the state would get rid of him.

15. The prison has a history of destroying documents and evidence in disciplinary cases. Pamela Sampson had documents disappear, I have had documents destroyed, I know of many cases where documents have disappeared. One could never document any disciplinary history at the prison just for this practice alone.

16. Deputy Warden O'Farrell had a monitor and control panel in his office so that he could access and record practically any camera in the prison.

17.  ~~[struck through and initialed]~~

18. In my opinion, none of the administration either observed or were interested in observing or protecting both constitutional civil rights or collective bargaining rights. The prison has a history of constantly losing suits for violations of these rights, then continuing on to ignore their protections. Furthermore when I proposed at a labor management meeting that we explain these constitutional and collective bargaining rights to management, they refused to allow us to explain them. They preferred to enforce their ignorance of the rights of their workers, in my opinion using ignorance as plausible deniability as their defense.

I, Ira L. Scherr, hereby state that the above-made affidavit is true and based upon my personal knowledge, and where this affidavit is based upon information and belief, I believe the information to be true.

Dated April 22, 2010

*Ira L. Scherr*
Ira L. Scherr

State of Maine

Lincoln, SS                                April 22, 2010

Personally appeared the above-named Ira l. Scherr who stated that the above-made affidavit by him is true, and where any statement in the affidavit is based upon information and belief, he believes the information to be true.

Before me: *Thomas M. Mangan*
Thomas M. Mangan, N.P.
Notary Public
State of Maine
My commission exp. 1/13/2011