

PLAINTIFF'S EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BRENDA CHOATE,
PERSONAL REPRESENTATIVE
of the Estate of RYAN RIDEOUT
of Mount Vernon, County of Kennebec,
and State of Maine
    PLAINTIFF

vs                      Docket NO. 1:08-CV-49 JAW

JEFFREY MERRILL, WARDEN, MAINE
Department of Corrections, individually
and in his representative capacity, now
or formerly of Warren, County of
Knox and State of Maine) et al

## AFFIDAVIT OF IRA SCHERR

1. I was employed by the Maine State Prison from August 18, 2003 through July 29, 2008. I worked as a Correctional Officer (sometimes referred to herein as Guards). My positions included assignment to the Special Management Unit ("SMU"), where I acted in the Local Control, and in all positions in the SMU. I was assigned to many other places as well, including Mental Health, B Wing, C Wing, and Roving which does relief in all positions.

2. During that time, from approximately the end of 2003 to July 2008, I was a Union representative. During most of the year 2006 (elections are set for November for service for the calendar year following but not always on time) I was a union representative at the prison through all positions from Shop Steward to Unit Chair. I started going to Labor Management meetings from winter 2006 on at the Prison as Unit Chair. Unit Chair was Senior Labor Representative at the

1

Maine State Prison. At each facility there is a Unit Chair. For 2006 I was the Vice-President, then for most or all of the year 2007, I was the Senior Representative of Labor as President of American Federation of State County and Municipal Employees ("AFSCME") Council 93, Local 2968, and responsible for over seven hundred correctional officers both at the Maine State Prison and the entire Maine Department of Corrections.

3. As the Unit Chair and as President, I attended Labor Management meetings with Management Staff at the Prison. During the years 2006 and 2007, including to my best knowledge all meetings concerning labor management. Security issues were a part of almost all the meetings. I wrote the agendas. When he was there the Warden conducted the meeting. James O'Farrell Sr. to my best recollection was present at almost every meeting.

4. The stated policy under which I was trained and all other Correctional Officers were trained at Maine State Prison was that each supervisor was vicariously liable for the conduct of the persons under their supervision and that this vicarious liability went all the way to the top. We were taught this was one of the reasons to write reports because otherwise our supervisors would be responsible for our actions. It was acknowledged and impressed on us to understand the implications of vicarious liability.

5. I am personally informed by guards that even today it is common knowledge that and in fact James O'Farrell Sr. oversaw and oversees all policies, procedures, protocols, and approved and approves training for the SMU. It is common knowledge that each person at the prison operates under vicarious liability and

2

supervisors are responsible for those working under them. This is taught by Captain David George or a designee to every person coming through in training.

6. Deputy James O'Farrell Sr, as a practical matter, is the person in management of the Maine State Prison, through whom passes every policy or procedure I saw. During my two year tenure all policies and procedures went through and existed or were adopted by his approval. He would sign off to my best knowledge on every policy, and he would often sign for the Warden as designee.

7. All Special Management Unit ("SMU")Policies and Procedures went through Unit Manager Doug Starbird to Deputy Warden James O'Farrell Sr. who exercised final authority, followed by the Warden.

8. In almost all instances, the Warden Jeffrey Merrill deferred to Deputy James O'Farrell Sr on Security Issues, Policies and Procedures, who oversaw all such policies and procedures.

9. After review by James O'Farrell Sr, all policies and procedures are generally rubber stamped by the Warden.

10. I practically never saw Warden Merrill in the SMU during my entire period of work. To my understanding, under applicable ACA (American Correctional Association) standards for accreditation, he or his designee above the level of Captain, is supposed to go into every Wing and POD at least once every week personally. This allows prisoners to have access to him.

11. Although Deputy James O'Farrell Sr. did not assign guards their individual positions, within his capacity as Deputy Warden for Security, James O'Farrell Sr.

saw every schedule as to where Guards were assigned every day and a copy of every schedule provided to him came through his office for his review.

12. Deputy James O'Farrell Sr. is responsible to approve how extraction teams operate and they have to have his approval. Deputy O'Farrell had responsibility for any extraction team that dealt with Ryan Rideout.

13. It is a common almost daily and night time fact that inmates "fish" or pass magazines, food, or whatever they want from one to the other from cell to cell. A guard does not have directly to give drugs to any one prisoner for other prisoners to have access to drugs or items. The process of fishing is allowed by the persons in SMU. The process of fishing is known to nearly everybody who works at the prison including the Warden of the Prison, who has access also to all cameras in the SMU and the process is allowed.

14. Guards are not inspected for having drugs at the Prison. I have spoken personally to Warden Jeffrey Merrill stating that I could bring an Uzzi into the Prison and not be caught. Other than change of shifts, in the evening after six p.m. a Guard can bring almost anything into the Prison. Thermoses are not opened. Metallic things can be put in thermoses or simply their pockets. Officers frequently are allowed to walk around the metal detectors. Guards on armed patrol have been known to accidentally enter the prison with a firearm, forgetting they had it on them. Ralph Nichols the prison inspector has smuggled a firearm into the Maine State Prison to demonstrate their lack of effective screening.

15. Drug testing is not done on officers and there is no psychological profiling of officers.

16. The SMU is on its own radio channel frequency. Deputy Warden O'Farrell Sr. as Chief of Security has a portable radio that can be tuned to the SMU frequency. At times he tunes into the SMU frequency and has responded in a supervisory manner when he has heard things going on in the SMU.

17. The Emergency buzzers in Local Control in SMU ring like a telephone and light up showing the cell calling. When the guards get tired of hearing emergency buzzers, ringing multiple times, Local Control can click on the screen which clears the buzzer. When an emergency buzzer is constantly being rung, Local Control will announce to the officer in the wing the number of the cell and say that cell number is constantly ringing up. If the officer feels he has taken care of the issue, he will say "he is all set." This is a code to ignore the buzzer. At this point, Local Control will clear the buzzer and keep clearing it each time it is rung. This is accepted policy and so long standing that it is impossible it would not be known to Deputy Warden O'Farrell Sr and Warden Merrill.

18. Discipline of prisoners in the SMU is often not enforced creating a hazard for individual prisoners.

19. Guards who are assigned to Suicide Watch are not to take their eyes off the subject being watched and are not to respond to the prisoners regardless of what the Inmates say. It is left up to a Guard on such a watch whether to radio a suicide threat within his hearing and such a Guard can choose to ignore it.

20. On information, Officer Peters was in Local Control at the time of Rideout's hanging. Duty Logs kept in the Local Control are also frequently falsified and filled out long after the fact. Therefore log entries are often not contemporaneous

with events and cannot be relied upon to be contemporaneous or accurate. This practice is known and tolerated by supervisors. Typically, if an Officer is going to leave, a Supervisor will say why don't you complete your log and to put in your entries from your recollection.

21. Regarding Inmate checks by Correctional Officers, outside doors which enter the Wing where Rideout was housed at the time he hung himself, every time Inmate checks are done it could be true that the secured doors are opened by local control, whether operated by Donielle Wilson, or any one else. However, it would not be appropriate and it would have been a violation of policy, on the night of Rideout's death, or any other night, in the SMU, "to open the secured doors to allow them access to check the inmates." During count, if an inmate's cell door is opened it creates a non-secure condition, which would halt count in the entire prison. Inmate doors cannot be opened on B wing unless inmates are handcuffed first. If an inmate is going to be escorted from the wing and they are still in B-wing status they would be four-pointed. Even application of this policy is inconsistent, on a daily basis. Numerous times correctional officers have allowed B-wing inmates out of their cells without any restraints.

22. It is common practice to violate policy. Application of policy is inconsistent depending on whom the Commanding Officer is and if it can be seen on Camera. The Cameras are used to surveil what goes on from the top down. The Administration, including Deputy O'Farrell Sr. sits in his office and watches monitors almost all day long.

23. In light of the above, it was standard practice for a team to wait to enter a cell with an inmate in it until everybody was there, the camera was running and the commanding officer (usually the sergeant) gave the command to open the door. I have personally operated the handheld video camera used in the SMU during a cell entry and it records picture and sound. Protocol required the commanding officer to order the inmate to comply and come to the door and 'cuff up'. If the commanding officer felt the inmate was not a threat he could enter with a team without having them wearing extraction gear.

24. Anecdotal accounts state correctional officers have immediately ordered a door to be opened in extreme situations. This could be construed as a violation of policy but adherence to the prime directive to save human life.

25. Application of discipline at the prison has been so inconsistent, arbitrary and capricious in my experience as a labor representative, that no correctional officer could guess what the response of management would be to any behavior. Therefore all actions of staff have been entirely inconsistent in every circumstance in response to the ever-changing rules on an unbelievably hourly basis dependent on who made the last order.

26. I personally, in a disciplinary meeting conducted by Warden Jeffrey Merrill, was told by him that it did not matter what anybody told me to do, that I must always obey my post orders regardless of any other commands. Naturally the command structure below him did not adhere to that order, but would not countermand this contradictory order.

27. Numerous requests for changes to policies and procedures and management practices are routinely ignored by management. They discourage any suggestions that there are problems with policies and procedures to the point that I testified to the Maine State Joint Standing Committee on Labor on February 25, 2008 that management at the Maine State Prison does not care about their employees and actually hate their employees and retaliate against people who complain. Martin Magnusson, the Commissioner of the Department of Corrections has confirmed that the management of the Prison does retaliate and he has been unable to stop this practice. For this reason the most recent senior union representatives at the prison have given up and resigned in frustration.

28. Prior to his death, I have had direct supervision duties on Ryan Rideout while assigned to the Mental Health Unit of the SMU. I developed a rapport with him such that he trusted me. Shortly before his death, while I was performing my duties as an institutional rover at the prison, Rideout called me to his cell and complained that he was being denied mental health services and that he had been unfairly placed in 'seg' and was extremely stressed out and nobody would listen to him. As I was not assigned to that unit I asked him if he had told anybody about his problem and he said he had told everybody. I did not report this since I felt I would be disciplined for making a report in an area I was not assigned to.

Date: JULY 15, 2009

Sworn to:

_Ira L. Scherr_
Ira Scherr

OATH

Before me appeared Ira Scherr and made oath that the above statement is true and correct, on personal knowledge unless otherwise indicated, and as to matters stated on information and belief, the affiant believes them to be true and correct.

Date: 07/15/2009

Thomas M. Mangen, NP
Notary Public ~~or Attorney~~
My Commission Expires
Jan. 13, 2011
State of Maine.