UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

TINO MARINO,                          )
                                      )
    Plaintiff,                        )
                                      )
v.                                    ) Civil No. 8-326-B-S
                                      )
COMMISSIONER, MAINE DEPARTMENT OF     )
CORRECTIONS, et al.,                  )
                                      )
    Defendants                        )
                                      )

**RECOMMENDED DECISION ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**
**JAMES L. O'FARRELL (Doc. No. 76)**

Tino Marino, who is proceeding on a third amended complaint, is suing nine defendants for his alleged mistreatment when he was[1] an inmate at the Maine State Prison. Herein I address a hybrid motion to dismiss/motion for summary judgment filed by Deputy Warden James L. O'Farrell who has supervisory responsibilities at the prison and who is also the father of a sergeant involved in a key event on September 26, 2006. On the evening in question Marino got into disciplinary trouble when he began talking to another inmate who was "locked in," thereby infringing prison rules. In response to an order by Officer Nova Hirsh, the officer on duty in Marino's unit that night, restricting Marino to his cell (a practice called 'tagging') for refusing to stop talking with this inmate, Marino expressed his incredulity and Marino grabbed his genitals with both hands as he walked towards his cell.

This conduct led Hirsch to order Marino to see the sergeant on duty, former Sergeant James O'Farrell, Jr, the moving defendant's son. During this meeting Marino was subjected to juvenile commands "to stand up, sit down, look me in the eyes, don't blink, etc." There is no

---

[1]     According to a recent affidavit submitted by Marino's attorney, Marino is currently living in Lubec, Maine. (Campbell May 24, 2010, Aff. ¶ 2, Doc. No. 139-2.)

dispute, that as a consequence of the meeting with Sergeant O'Farrell, Officer Jeffery King ("the rover" for the unit), and Officer Hirsch, Marino was ordered by Sergeant O'Farrell to walk back to his cell holding his genitals, an order with which Marino complied while being escorted by Officers King and Hirsch and Sergeant O'Farrell.  Deputy Warden James L Farrell, along with Warden Merrill and Commissioner Magnusson, form the troika of individuals against whom Marino has filed suit based upon claims of supervisory liability.  Because the factual record for each supervisor differs greatly, the attorney for defendants filed separate motions on behalf of each defendant.  I have followed counsel's lead and addressed each of these defendants separately, relying upon the separate factual record for each defendant.  Based on the summary judgment record below and for the reasons that follow, I recommend that the Court grant summary judgment in favor of Deputy Warden James L. Farrell on his constitutional and state law counts.[2]

## DISCUSSION

**Summary Judgment Standard**

"The judgment sought" by Deputy Warden James L. O'Farrell, "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). The purpose of summary judgment " 'is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' " Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995) (quoting Wynne v. Tufts Univ. School Med., 976 F.2d 792, 794 (1st Cir. 1992).) "A Rule 56 motion may well end the

---

[2] It may be that this defendant is entitled to dismissal based on the complaint allegations against him. However, as with the other six defendants who have also filed hybrid motions, I elect to proceed with the summary judgment analysis in the interest of definitively determining as to all the defendants -- in one round of recommended decisions and objections -- if there are any claims that deserve proceeding to trial.  Defendants O'Farrell, Jr. and King have moved for summary judgment only, King having unsuccessfully moved for dismissal earlier in this action and O'Farrell apparently recognizing that such a motion would have been futile in his case.

case unless the party opposing it demonstrates the existence of a trialworthy issue as to some material fact." Id.

**Supervisory Liability**

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 556 U.S. __, __, 129 S. Ct. 1937, 1948 (2009).  To survive summary judgment Marino must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 1948-49.  Mere knowledge of a subordinate's wrongful conduct does not establish 42 U.S.C. § 1983 liability for a supervisor.  Rather, there must be an affirmative link between the conduct of the supervisor and the constitutional deprivation experienced by Marino.  See Sanchez v. Pereira-Castillo, 590 F.3d. 31, 49 (1st Cir. 2009); Maldonado v. Fontanes, 568 F.3d 263, 274-75 (1st Cir. 2009)[3]; Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005).  Examples of affirmative links include "supervisory encouragement, condonation or acquiescence" in relation to the deprivation.  Maldonado, 568 F.3d at 275 (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)).  Deliberate indifference can also result in supervisory liability.  Id.

**Material Facts**

James Lee O'Farrell is a Deputy Warden at the Maine State Prison.  (SMF ¶ 1; Resp. SMF ¶ 1.)  Deputy Warden O'Farrell was working in that capacity during the period of Marino's incarceration.  (SMF ¶ 2; Resp. SMF ¶ 2.)  He has worked for the Maine State Prison for thirty-one years.  (SMF ¶ 3; Resp. SMF ¶ 3.)  He has never been the subject of any disciplinary action during

---

[3] Maldonado did reflect: "Some recent language from the Supreme Court may call into question our prior circuit law on the standard for holding a public official liable for damages under § 1983 on a theory of supervisory liability." Id. at 724 n.7.

3

his tenure at the Maine State Prison. (SMF ¶ 4; Hirsch Dep. at 35:5-22.)[4] As a Deputy Warden, he is an assistant to the Warden and is responsible for security at the Maine State Prison. (SMF ¶ 5; Resp. SMF ¶ 5.)  Former Sergeant, James E. O'Farrell, is Deputy Warden James L. O'Farrell's son. (SMF ¶ 6; Resp. SMF ¶ 6.)

James E. O'Farrell worked as a correctional officer at the Maine State Prison from October 17, 1997, to May 20, 2004, and August 13, 2004, to December 9, 2006. (SMF ¶ 7; Resp. SMF ¶ 7.) James E. O'Farrell was working in the position of sergeant at the time of the alleged incident with Marino on September 26, 2006.  (SMF ¶ 8; Resp. SMF ¶ 8.)

Deputy Warden O'Farrell was not involved with any performance evaluations of his son while he was employed at the Maine State Prison and would always defer any evaluations or complaints regarding his son to another captain or another deputy warden. (SMF ¶ 9; O'Farrell Dep. at 43:4-12.)  The process to become a sergeant at the Maine State Prison includes a written application to the Maine Department of Corrections in Augusta which assesses the applicants and returns the names of the authorized applicants who are qualified for the position to the Maine State Prison. (SMF ¶ 10; O'Farrell Dep. at 46:22 -48: 11.)  At the prison, usually the top six applicants take a written test and answer questions before a board of three different people. The oral questions asked by the board come from a maintained list of 400 standard questions. There are study guides available for applicants to study the questions before appearing before the board. (SMF ¶ 10; O'Farrell Dep. at 46:22 – 48:11.)  The board will give the names of the top three applicants to the Warden and the Warden will make the final determination of who will be promoted to the position of sergeant. (SMF ¶ 11; O'Farrell Dep. at 46:22 -- 48:11.)  Deputy Warden O'Farrell was not

---

[4] Marino purports to qualify this statement by stating that there is no present documentary evidence available to dispute it. (Resp. SMF ¶ 4.)  He cites to Paragraph 15 of an affidavit of former MSP employee Ira Scherr is which Scherr represents that the prison has a history of destroying documents and evidence in disciplinary cases. (Scherr Apr. 22, 2010 Aff. ¶ 15, Doc. No. 102-4.)  Scherr maintains: "One could never document any disciplinary history at the prison just for this practice alone."  (Id.)

involved with any part of this process when his son was promoted to the position of sergeant at the Maine State Prison. (SMF ¶ 12; O'Farrell Dep. at 45:1 – 46:1.)

Marino's response to this sequence of facts is to qualify or deny relying particularly on two paragraphs of the April 22, 2010, affidavit of Ira Scherr, a former MSP employee. Therein Scherr maintains that James O'Farrell Jr. was promoted at the prison by dint of a custom of giving special treatment to employees related to other employees. He contends that many supervisors were appalled by this practice. One sergeant complained to Scherr that a week after James O'Farrell Jr. took the test he could not answer the most basic questions for a sergeant although he purportedly achieved a 100% perfect score. (Scherr Apr. 22, 2010, Aff. ¶ 10, Doc. No. 102-4.) Scherr asserts that he has seen documentation that Deputy Warden O'Farrell brought hot chocolate into the room while his son was taking his boards for the benefit of the "testers." Scherr describes this as interfering and intimidating which "under normal circumstances" would be "seen as serious undue influence." (Id. ¶ 11.) Marino also insists that the theory that the names of the top three applications go to the Warden for final determination is untrue, here relying on Paragraph 9 of Scherr's July 17, 2009, affidavit which avers that "policies and procedures" are "generally rubber stamped by the Warden" after review by Deputy Warden O'Farrell. (Scherr July 17, 2009, Aff. ¶ 9, Doc. No. 102-5; see also SAMF ¶¶ 1,2.)[5] This affidavit was prepared in a different case which concerned policies and procedures for responding to attempted suicides.

Deputy Warden O'Farrell was not present for any of the incidents alleged by Marino on September 26, 2006, December 7, 2006, February 1, 2007, and August 24, 2007. (SMF ¶ 14; Marino, Dep. at 89:24 -90:4.)[6]

---

[5] I strike Statement of Additional Fact Paragraph 3. Marino does not cite to a particular paragraph of Scherr's July 15, 2009, affidavit and I agree with the defendant that the statement is irrelevant to the facts of this case as they pertain to Marino's claim against Deputy Warden O'Farrell.

[6] I am giving Marino some leeway here but I will not let him drift as far as he seeks by advancing the qualification of this paragraph in reliance on Scherr's July 17, 2009, and April 22, 2010, affidavit statements about the deputy warden's general ability to monitor MSP goings-on from his office.

5

Marino filed forty-one grievances. (SMF ¶ 16; Costigan Aff. ¶ 4, Doc. No. 77-10.) He felt it was okay to file grievances. (SMF ¶ 16; Marino Dep. at 62: 18 -19.) Deputy Warden O'Farrell was not the subject of any of the forty-one grievances filed by Marino. (SMF ¶ 17; Costigan Aff. ¶ 9.) Marino responds by seemingly insisting that all the grievances were in compliance with the grievance policy and that they were Marino's "legal right." (Resp. SMF ¶¶ 15,16.) However his record support for these responses is Paragraph 6 of the Costigan affidavit which states: "The plaintiff filed thirty-six of these grievances after December 6, 2006, all of which were accepted unless they did not comply with the grievance policy requiring an attempt at informal resolution and filing within the required time frame." (Costigan Aff. ¶ 6.) He also alleges that the "'retaliatory culture'" of MSP means that Deputy Warden O'Farrell was involved in all forty-one of Marino's grievances. (Resp. SMF ¶ 17.)[7]

Deputy Warden O'Farrell was never involved with the investigation of the incident on September 26, 2006. (SMF ¶ 18; O'Farrell Dep. at 33: 6 -8; Merrill Aff. ¶ 12.) Deputy Warden O'Farrell was never involved with the investigation of any incidents subsequent to the September 26, 2006, incident involving Marino. (SMF ¶ 19; O'Farrell Dep. at 74: 19- 75:20; Costigan Aff. ¶ 10.)[8] Deputy Warden O'Farrell never had any conversations with Marino. (SMF ¶ 20; Resp. SMF 20.)

---

[7] His 'record citation' for this qualification is "See retaliation of the first four plaintiff grievances. 06-MSP-360 and the following three."

[8] Marino purports to deny these two paragraphs. (See Resp. SMF ¶¶ 18, 19.) I do not countenance these responsive paragraphs. Even if I could locate "investigation of Dwight Fowles, page 4, October 17, 2006, notation" somewhere in this docket that has 144 docket entries and countless attachments, "the fact of the missing videos" is not sufficient to tie this defendant into the investigation of this incident. With respect to the affidavits of Goucher and Scherr, even if they were to testify at trial to this defendant's "history of involvement in the investigations of his son's conduct including pressuring inmates and subordinates to protect his son's reputation and employment," this would not be sufficient evidence that he did so apropos the September 26, 2006, incident.

Which brings me to Marino's additional statement of facts related to this issue. Marino contends that, to Scherr's knowledge, there have been no instances of Deputy Warden James O'Farrell investigating a single complaint brought to him regarding his son, James E. O'Farrell, Jr. (SAMF ¶ Scherr Jan, 29, 2010, Aff., Doc. No. 102-3.) Also to Scherr's knowledge, Deputy Warden James O'Farrell has never responded to a single complaint of the incompetence of James E. O'Farrell, Jr., his son, brought by any party, which included multiple complaints of the unprofessionalism of Sgt. James E. O'Farrell. (SAMF ¶ 5; Scherr Jan. 26, 2010, at 2.) Also, to Scherr's knowledge, Deputy Warden James L. O'Farrell ignored the sexual harassment complaints of Flo Harrelson brought against Sgt. James E. O'Farrell. (SAMF ¶ 6; Scherr Jan. 26, 2010, at 2.)

Marino forwards the following additional facts pertaining to the video record of the September 26, 2006, incident. This incident took place in the medium unit which is an area that the Maine State Prison surveillance equipment covers and, at the time, it was standard practice to keep a video record of an incident where an assault is alleged to have occurred. (SAMF ¶ 11; J. L. O'Farrell Dep. at 9:19-23; 12:23 -13:8; 19:21 – 20:7, Doc. No. 101-1) It was standard practice, at the time of the September 26, 2006, incident to maintain and secure surveillance videos for thirty days and this was accomplished through an automated system that does this automatically. (SAMF ¶ 12; J. L. O'Farrell Dep. at 6:23 -7:10, 15:12-19.) James O'Farrell, Sr., as Deputy Warden, had the authority on September 26, 2006, to use his computer to view the content of surveillance cameras at the Maine State Prison and maintains surveillance equipment in his office. (SAMF ¶ 13; J.L. O'Farrell Dep. at 16:2-9, 5: 14-16.) On October 17, 2006, only twenty-one days after the September 26, 2006, incident, Officer Dwight Fowles who was appointed by Warden Merrill to conduct the investigation into the September 26, 2006, incident, noted in his investigatory report that there was no video available of the incident on the video system. (SAMF ¶ 14; Fowles Investigation at 5, Doc. No. 97-3; Merrill SMF ¶ 8.)

---

In response the defendant points to O'Farrell's testimony that it would have been totally inappropriate for him to participate in any way in handling complaints against his son or in conducting evaluation of his work. (Resp. SAMF ¶ 4, 5.) With respect to the Flo Harrelson complaint, it is not clear whether or not Scherr's report on this would be hearsay or flow from his personal involvement. The other name listed in the additional statement of fact along with Flo Harrelson does not appear in Scherr's affidavit.

With respect to Statement of Additional Fact Paragraph 7, the cited page of the Scherr affidavit absolutely does not support the assertion that the defendant made it a personal goal to fire anyone who complained about his son. Additional Statements of Fact Paragraphs 8 and 9 rely on hearsay accounts of inmate Jason Goucher. For instance, although Goucher could testify about his interactions with Deputy Warden O'Farrell with regards to the Pamela Samson harassment affair, the material representation that this was because she had claims against his son is based on a unexplained belief, to wit "I believe that Pamela Samson has accused the Deputy Warden James O'Farrell's son, Sgt. O'Farrell of sexual harassment." (Goucher Aff. At 2, Doc. No. 97-4.) With respect to the allegation about the defendant's success in getting another inmate to sign an affidavit that he had sex with Samson, it is an assertion premised on something Goucher heard. (SAMF ¶ 9; Goucher Aff. at 4-5.)

Finally, relying on the April 22, 2010, affidavit of Scherr, Marino asserts that Deputy Warden James L. O'Farrell covered for all the sexual harassment complaints filed against his son during his MSP tenure. (SAMF ¶ 10; Scherr Apr. 22, 2010 Aff. ¶ 14.) Paragraph 14 is based on hearsay. Scherr cites his awareness of complaints, his failure to hear that any satisfaction was received by the complainants, his assumption that the defendant quashed the complaint, his having learned of numerous cash settlements, and his having been told that if the State knew of the cost incurred through settlements for his son's misconduct the defendant would be fired . (Scherr Apr. 22, 2010, Aff. ¶ 15.)

7

Deputy Warden O'Farrell's response to these video-related paragraphs is that he testified that it was his understanding at the time that the MSP could keep videos on the server for up to thirty days to review. (Resp. SAMF ¶ 12; J. L. O'Farrell Dep. at 7:8-10.) Darlene Hale, the MSP Informational Systems Support Specialist explains that in September 2006, video recording would last until the storage memory was full and then the system would record over itself. At the time in question that would be, at most, twenty days. (Resp. SAMF ¶ 12; Hale Aff. ¶ 8, Doc. No. 124-6.) In order to save a video recording it would have to be retrieved and saved or recorded onto a local hard drive or CD. (Resp. SAMF ¶ 12; Hale Aff. ¶¶ 10, 11.) While Deputy Warden O'Farrell maintains security equipment in his office, he testified that he did not have access to to the video recording of the alleged September 26, 2006, incident because of a glitch in the system. (Resp. SAMF ¶ 13; J. L. O'Farrell Dep. at 17-18.) For his part, Unit Manager Fowles requested a copy of the video from Hale the day he was assigned to investigate the matter. (Resp. SAMF ¶ 14; Fowles Aff. ¶ 5 & attached notes; Fowles Investigation at 4.) At that time Fowles believed that the time of the incident was 2100 hours. (Resp. SAMF ¶ 14; Fowles Aff. ¶ 5 & attached notes; Fowles Investigation at 4.) When the video of that time frame was reviewed it did not show any of the events described. (Resp. SAMF ¶ 14; Fowles Aff. ¶ 6 & attached notes; Fowles Investigation at 5.) Fowles learned that the proper time of the alleged incident was 2000 hours, and he requested the video for the corrected time frame be pulled but by that point it was not available. (Resp. SAMF ¶ 14; Fowles Aff. ¶¶ 7-10 & attached notes; Fowles Investigation at 5.) The defendant insists that there was no tampering or destruction of the video recording at the MSP in September or October 2006. (Resp. SAMF ¶ 15; Hale Aff. ¶ 12.)

Former Sergeant O'Farrell was discharged and Officer King disciplined based on the recommendation of Dwight Fowles's investigation. (Resp. SAMF ¶ 14; Merrill Aff. ¶¶ 15, 16.) The actions of Sergeant James O'Farrell on September 26, 2006, did not constitute a standard practice or policy for discipline at the Maine State Prison. (SMF ¶ 21; O'Farrell Dep. at 26: 15 - 20.)

Corrections officers are not trained in this method of discipline. (SMF ¶ 22; O'Farrell Dep. at 26: 21-23. ) Marino responds that although Sergeant O'Farrell's actions were not official policy, they were standard practice at the MSP. (Resp. SMF ¶ 21; Scherr Apr. 22, 2010, Aff. ¶¶ 5,6,7,8, 13.) But the Scherr affidavit does not support this particular point. He acknowledges that the initial academy training does not allow the disciplinary methods used by Sergeant O'Farrell, but complains that the MSP administration does not prosecute the crimes and misdemeanors of guards. (Resp. SMF ¶ 22; Scherr Apr. 22, 2010, Aff. ¶ 9.) Defendant Deputy Warden O'Farrell stated that the sit-down/stand-up method used by Defendants King and Sergeant O'Farrell is absolutely not the policy or practice at MSP. (SAMF ¶ 15; Resp. SAMF ¶ 15.) King indicated in answer to a written question of whether he instructed Marino "to stand up, sit down, look me in the eyes, don't blink, etc." that he had "done this" (the same thing) to other prisoners. (SAMF ¶ 16; Resp. SAMF ¶ 16.) Defendant Sergeant O'Farrell also indicated in answer to a written question whether he instructed Marino "to stand up, sit down, look me in the eyes, don't blink, etc." that he had "done this before with other prisoners." (SAMF ¶ 17; Resp. SAMF ¶ 17.) .

Marino has filed only one notice of tort claim with the Office of the Attorney General for the incident on September 26, 2006. (SMF ¶ 23; Sproul Aff. ¶ 3, Doc. No. 77-12.) [9]

**Analysis**

In his memorandum responding to Deputy Warden O'Farrell's dispositive motion Marino explains that he is suing this defendant in his individual and official capacity[10] and that he is alleging that he violated Marino's Eighth Amendment rights. (Resp. Mem. Deputy Warden O'Farrell's Dispositive Mot. at 2.) He expands: "Deputy Warden O'Farrell is not named in any of the incidents

---

[9] Marino does not dispute the simple statement that he filed one notice of claim. His qualification about the other ways he put each defendant on "substantial notice" does not qualify this statement but is in anticipation of the argument expected.

[10] Unlike in his responses to the other defendants' dispositive motion, Marino has not expressly disavowed his official capacity suit as against Deputy Warden O'Farrell but this seems to be an oversight as there is no basis to conclude that such a theory of liability apropos this defendant is any less ill conceived than against the other defendants. Quite the contrary, Marino's theory of liability as to this defendant is based less on his responsibilities as supervisor at the prison and more on his personal responsibility for the conduct of his son.

9

alleged in the complaint after that date, which is not to say that he was not personally involved." (Id. at 2) (emphasis added). After setting forth a section on the motion to dismiss standard, which is not relevant for purposes of my discussion given my decision to proceed on the summary judgment record, Marino provides a section on the summary judgment standard. (Id. at 5.)[11] Marino states:

> The Defendant Deputy Warden James O'Farrell claims that since he was not present for any of the various incidents raised by the plaintiff, the plaintiff "has to" be proceeding under the theory of supervisory liability against the defendant as the Deputy Warden rather than for any direct action by him against the Plaintiff. The Deputy Warden has neglected the fact that the apple does not fall far from the tree.
> The Defendant Deputy Warden James O'Farrell then "assumes" that the plaintiff must be proceeding under a theory of supervisory liability against the Defendant as the Deputy Warden rather than for any direct action by him against the plaintiff. The Defendant Deputy Warden James O'Farrell then cites the recent Ashcroft v. Iqbal, –U.S.—, 129 S.Ct. 1937, 1948 (2009) for the support of his theory that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*".
> In light of the Iqbal decision, a plaintiff alleging supervisory liability must establish an "affirmative link between the behavior of a subordinate and the action or inaction of his supervisor' exists such that 'the supervisor's conduct led inexorably to the constitutional violation.'". Maldonado v. Fontaines, 568 F. 3d. 263, 274-275 (1st. Cir. 2009) citing Pineda, 533 F.3d. At 54.
> The Plaintiff has presented no allegation that Deputy Warden O'Farrell was present for any of the alleged violations of Constitutional rights; however, none of the Constitutional violations would have occurred "but for" Deputy Warden O'Farrell's "supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference". There is an ... "affirmative link between the conduct of the supervisor and the constitutional deprivation experienced by the plaintiff." Sanchez v. Pereira-Castillo, 590 F.3d. 31, 49 (1st. Cir. 2009).

(Id. at 6-7)(emphasis added).

Although Marino has identified the current standard for establishing supervisory liability he has utterly failed to realize that the record evidence in no way supports an inference that Deputy Warden O'Farrell was affirmatively linked as a supervisor to the alleged illegal conduct of any of those under his supervision. It is beyond the pale to contend that the mere fact that he is the father of

---

[11] In this section Marino does digress a bit back into the Federal Rule of Civil Procedure 12(b)(6) land. (Id. at 6.)

Sergeant O'Farrell – the tree from which the apple fell – is sufficient to hold the father liable under a civil rights state action theory of liability for his son's conduct on September 26, 2006. Even though there is some precedent for the proposition that the sins of the father can be visited on the son in the evidentiary milieu of state of mind, see Villanueva v. Village Disc. Outlet, Inc., Civ. No. 07-4626, 2009 WL 3617444, 5 (N.D.Ill. Oct. 28, 2009) ("Villanueva has not provided any evidence that [Hathway Jr.'s] harassment was related to her national origin (as opposed to, say, personal animosity toward her by Hathaway Jr.). Still, with all reasonable inferences drawn in her favor and given the biased comments made by Hathaway Sr., a trier of fact might reasonably believe that the apple does not fall far from the tree and that Hathaway Jr.'s acts were based on Villanueva's national origin."), what Marino is trying to do is visit the sins of the son on his father, "reversing the ancient adage," see S.E.C. v. Andrescu, 117 Fed.Appx. 160, 161 & n. 1, 2004 WL 2830740, 1 & n.1 (2d Cir. 2004)("Reversing the ancient adage, this case demonstrates that sometimes the sins of the child are visited upon the father, and even the mother."). See also Tison v. Arizona, 481 U.S. 137, 183-84 & n. 20 (1987). In this decision I am weighing the father's culpability for his son's actions, and not the son's culpability as influenced by his father, and unlike the circumstances in S.E.C. v. Andrescu, there is no benefit running to the parents for the son's misconduct (in that case justifying disgorgement of funds received as a consequence of their son's fraudulent securities scheme). Quite the contrary, given the presumed familial disgrace in the MSP community stemming from Sergeant O'Farrell's disciplinary finding and employment severance, there is little doubt that the events of September 26, 2006, precipitated some not insubstantial personal distress for this defendant at work and at home. Moving beyond this digression necessitated by Marino's conjuring of hollow adage rather than sound legal principle, the essential reason that there is no triable issue on Marino's first count as it pertains to James L. O'Farrell is that there is not a speck of evidence in this record that Deputy

11

Warden O'Farrell had any kind of tangible supervisory responsibility for his son in the workplace, or that he encouraged, condoned, or acquiesced to his son's conduct towards Marino on September 26, 2006. Marino has failed to generate admissible evidence that the Deputy Warden encouraged or condoned other officers in the alleged act of retaliation after he grieved this incident.

I note that the facts set forth above do attempt to connect Deputy Warden O'Farrell to a theory that the videos taken of this September 26, 2006, were taped over by the time Fowles identified the proper time sequence. There is no cognizable evidence that this defendant had anything to do with this reality. The evidence on this score that is left uncontested by Marino is that O'Farrell did not have an opportunity to even view the video had he wanted to. There is no evidence that he had anything whatsoever to do with the timing of the re-recording. What is more, I fail to see how evidence that Deputy Warden O'Farrell did view the video before it was recorded over or deliberately did not view the video could advance Marino's claim that the Deputy Warden was liable as a supervisor for the September 26, 2006, incident or the alleged retaliation by other officers thereafter. There is not a shred of evidence that this defendant destroyed the video and nor would it really matter if he did as the three officers involved in the discipline of Marino that day conceded that the mistreatment complained of occurred.[12] Marino has not placed in dispute the very crucial evidence that the supervisory staff at the jail did not condone or promote the tactics used by Sergeant O'Farrell that evening. He does speak of the "retaliatory culture" at the prison but he relies on the fact of his own subsequent grievances

---

[12] I am aware that Marino is now -- years later -- attempting to add an allegation that during the parade back to the pod his head was slammed against the wall. I explain my disinclination to credit this extra seasoning in the context of my recommended decisions on the motions by the three officers who accompanied Marino back to the pod. Beyond the fact of a father-son relationship, Marino has no admissible evidence that Deputy Warden O'Farrell encouraged his son to use any of the tactics employed that evening including this alleged "excessive force." To the extent that Marino believes that the video of the incident would have demonstrated that he was not directing his crotch grab gesture at Officer Hirsch there is no dispute that Officer Hirsch saw the gesture and this is what triggered his concededly inappropriate discipline that evening.

which are proof of his complaint but not evidence of the validity of this characterization. He has no concrete, admissible evidence that Deputy Warden O'Farrell "was involved in all forty-one of Marino's grievances."

Finally with regards to Count One, testimony that the Deputy Warden brought hot chocolate into the room while his son was taking his boards for the benefit of the "testers" does not support a reasonable inference that this defendant was attempting to intimidate and exert "serious undue influence." And even if it was so, the simple fact that Deputy Warden O'Farrell had some sort of spectral influence over the examination results by offering the testers a warm chocolaty drink, a conclusion that the father assisted his son's prospects in his promotion in this fashion is not sufficient to affirmatively link him to the allegations of an Eighth Amendment violation at the hands of his son after the promotion decision. [13] It is further worth noting that even if Deputy Warden O'Farrell did try to influence the disciplinary outcome for his son, he, one, was clearly not successful and, two, the question of how the prison resolved the employment prospects of Sergeant O'Farrell after the incident is not material to whether or not Sergeant O'Farrell violated Marino's rights on the night in question. See See, e.g., Bury v. Bradish, No. 1:05-cv-00600-LJO-GSA PC, 2008 WL 2131566, 3 (E.D. Cal. 2008) (recommended decision).

*State Law Counts*

Marino's defense of his state law counts against Deputy Warden O'Farrell's is befuddling. He writes:

> Because he was not present for any of the matters including the claim of "intentional infliction of emotional distress". If the Defendant James Lee O'Farrell had done his job and investigated his sons prior violations of civil rights, as it was his duty as Chief of Security at the State Prison, Tino A. Marino would never have suffered at the hands of an incompetent and sexually harassing son. It is further apparent from the Notice of Tort Claim filed by the plaintiff, that the Deputy Warden "retaliated" against the plaintiff for his initial complaint

---

[13] I have explained in a prior footnote why Marino's reliance on the Ira Scherr affidavits is insufficient to warrant a trial on his claim against this defendant.

13

against the Deputy Warden's beloved son as described in the first four of
plaintiff's grievances.

(Resp. Mem. Deputy Warden L. O'Farrell Mot. Summ. J. at 12.)

First, the record evidence is that it was expressly <u>not</u> Deputy Warden O'Farrell's job to investigate allegations pertaining to his son. Second, the notice of claim certainly mentions supervisory liability stating that Sergeant O'Farrell's supervisors were aware of his past incidents of misconduct and failed to take proper disciplinary measures. But this statement of claim in the notice and the summary judgment record as a whole does not identify a tangible "retaliatory act" by Deputy Warden O'Farrell.

As for the merits of the assault count, there can be no theory on which this defendant could be held liable for assault and Marino does not defend any theory of recovery on this count apropos Deputy Warden O'Farrell.

"To withstand a defendant's motion for summary judgment on a claim of intentional infliction of emotional distress," under Maine law," a plaintiff must present facts in support of each of the following four elements:"

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct;
> (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community";
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
> (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

<u>Curtis v. Porter</u>, 2001 ME 158, ¶ 10, 784 A.2d 18, 22 -23 (quoting <u>Champagne v. Mid-Maine Med. Ctr.</u>,1998 ME 87, ¶ 15, 711 A.2d 842, 847 in turn quoting <u>Loe v. Town of Thomaston</u>, 600 A.2d 1090, 1093 (Me.1991)) (footnote omitted). <u>Curtis</u> recognized that "a defendant may be liable for intentionally or recklessly inflicting emotional distress." 2001 ME 158, ¶ 10 n.9, 784

A.2d at 23 n.9. Marino's argument that Deputy Warden O'Farrell could be held liable for the reckless infliction of emotional distress on the facts of this summary judgment record is not only confusingly argued it is utterly frivolous.

*Conclusion*

For these reasons I recommend that the Court grant James L. O'Farrell judgment on all three counts of Marino's complaint.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 30, 2010