# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| TINO MARINO, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) Civil No. 8-326-B-S ) |
| COMMISSIONER, MAINE DEPARTMENT OF CORRECTIONS, et al., | ) ) ) ) |
|     Defendants | ) ) |

**RECOMMENDED DECISION ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT REGIS PREVOT (Doc. No. 78)**

Tino Marino is suing multiple defendants alleging that his rights under the federal and state constitutions were violated when he was an inmate at the Maine State Prison. He also alleges that the defendants assaulted him and inflicted emotional distress in violation of state tort law. This recommended decision addresses a dispositive motion filed by former correctional officer Regis Prevot whose only actionable encounter with Marino occurred on December 7, 2006. The federal claim is one of unconstitutional use of force in violation of Marino's right as a convicted inmate under the Eighth Amendment of the United States Constitution that prohibits cruel and unusual punishment. I recommend that the court grant this dispositive motion as to the constitutional count. With regards to the state law counts of assault and intentional infliction of emotional distress, Marino never filed a notice of claim as to this incident and so he cannot proceed to trial on those supplemental claims.[1]

---

[1] Marino "concedes the point that the claims against the defendants in their official capacity w[ere] ill conceived" and subject to dismissal. (Resp. Mem. Prevot Dispositive Mot. at 7 n. 2.)

**DISCUSSION**

**Summary Judgment Standard**

"The judgment sought" by Regis Prevot, "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). The purpose of summary judgment "'is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995) (quoting Wynne v. Tufts Univ. School Med., 976 F.2d 792, 794 (1st Cir. 1992).) "A Rule 56 motion may well end the case unless the party opposing it demonstrates the existence of a trialworthy issue as to some material fact." Id.

**Eighth Amendment Standard**

As the First Circuit summarized in Skinner v. Cunningham vis-à-vis Eighth Amendment unconstitutional force allegations:

> The framework for analyzing such claims was set forth by the Supreme Court in Whitley v. Albers, 475 U.S. 312 (1986), and Hudson v. McMillian, 503 U.S. 1 (1992). Generally speaking, "[a]fter incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Whitley, 475 U.S. at 319 (internal quotation marks omitted). The critical question in such a case is whether the force was applied "maliciously and sadistically for the very purpose of causing harm," id. at 320-21, rather than "in a good-faith effort to maintain or restore discipline." Hudson, 503 U.S. at 7.

430 F.3d 483, 488 (1st Cir.2005).

**Facts**

Regis Prevot was a correctional officer at the Maine State Prison for just under five years. (SMF ¶ 1; Resp. SMF ¶ 1.) Prevot left his employment at the Maine State Prison in June 2009 to

2

work for the U.S. State Department. (SMF ¶ 2; Resp. SMF ¶ 2.) Prevot was working as a correctional officer during the period of Marino's incarceration at the Maine State Prison from September 2006 to March 2008. (SMF ¶ 3; Resp. SMF ¶ 3; SAMF ¶1; Resp. SAMF ¶ 1.) Prevot was employed as a correctional officer on December 7, 2006, and was working in that capacity on that day. (SMF ¶ 4; Resp. SMF ¶ 4.) He was working the first shift in the Mental Health Unit of the Special Management Unit. (SMF ¶ 5; Resp. SMF ¶ 5.) Officer Regis Prevot is a correctional officer at the Maine State Prison who was also working on December 7, 2006, in the Mental Health Unit. (SMF ¶ 6; Resp. SMF ¶ 6; SAMF ¶1; Resp. SAMF ¶ 1 .) At this time, Marino was housed in the A-1 pod of the Mental Health Unit. (SMF ¶ 7; Resp. SMF ¶ 7.)

On September 26, 2006, there was an incident with Marino involving defendants Sergeant O'Farrell, Officer King, and Officer Hirsch.[2] Following the September 26, 2006, incident, Marino filed a grievance on October 19, 2006. (SAMF ¶ 14; Marino Affidavit ¶ 29; Resp. SAMF ¶ 14; Costigan Aff. ¶ 11 & Ex. 1.) According to Marino, after filing this grievance, Marino began to experience retaliation from "other guards" and prison employees at the Maine State Prison. (SAMF ¶ 15; Marino Aff. ¶¶ 29-34.)

Marino was housed in the Mental Health Unit from November 2, 2006, until December 7, 2006, and again from March 26, 2007, until November 27, 2007. (SMF ¶ 8; Resp. SMF ¶ 8.) Dr. Maureen Rubano is the Director of the Mental Health Services at the Maine State Prison and in charge of the Mental Health Unit and has worked in that capacity since 2003. (SMF ¶ 9; Resp. SMF ¶ 9.) On December 4, 2006, Dr. Maureen Rubano made an individual treatment plan for Marino including a requirement that Marino keep his cell clean and orderly. (SMF ¶ 10; Resp.

---

[2] I address the facts material to the claims against those defendants in separate recommended decisions on their motions for summary judgment. Although Marino includes a series of facts outlining the incident (SAMF ¶¶ 2-13) they are not material to the resolution of this motion filed by Officer Prevot although Marino can rest assured that I am very cognizant of the background when addressing Prevot's defense of his claims in this motion.

3

SMF ¶ 10.) Dr. Rubano made this plan after being informed by correctional officers in the Mental Health Unit of Marino's inability to comply with the rules of the unit and the security concerns raised by his behavior. (SMF ¶ 11; Resp. SMF ¶ 11.)

According to Marino, on December 6, 2006, Warden Jeffrey Merrill came to see Marino and told him to stop filing grievances and stop doing legal work. (SAMF ¶ 16; Marino Apr. 2, 2010, Aff. ¶ 36.) Marino explained to Merrill and grievance officer Bob Costigan how he was being retaliated against and wanted it to stop and the Warden told him that he acknowledged his grievances and he would stop the retaliation, but he never did. (SAMF ¶¶ 17, 20; Marino Aff. ¶ 37.) Marino continued to file grievances reporting incidents of retaliation for continuing to conduct legal work. (SAMF ¶18; Marino Aff. ¶ 41.) The incidents of retaliation included the tearing up of Marino's grievances and other legal work, as well as numerous assaults. (SAMF ¶ 19; Marino Aff. ¶¶ 65-67, 71-72, 76, 77-80, 83-85.) Having acknowledged the grievances filed by Marino, Merrill admitted he was aware of the reports of retaliation complained of by Marino. (SAMF ¶ 20; Marino Aff. ¶ 37.)

Prevot adds that Jeffrey Merrill assigned Unit Manager Fowles to conduct an investigation of the September 26, 2006, incident, disciplined the culpable parties based on that investigation, and granted Marino's grievance. (Resp. SAMF ¶ 16; Merrill Aff. ¶¶ 10, 13-16, 20; Costigan Aff. ¶ 13 & Ex. 1.) Merrill additionally wrote a letter to the Advocate requesting that she assist Marino in the grievance process. (Merrill Aff. ¶ 27 & Ex.1.) Jeffrey Merrill never told Marino not to file grievances. (Resp. SAMF ¶¶ 16, 20; Merrill Aff. ¶ 23; Costigan Aff. ¶ 16.) According to the grievance record, Marino filed thirty-six of his forty-one grievances after December 6, 2006. (Resp. SAMF ¶ 17; Costigan Aff. ¶ 6.) Jeffrey Merrill responded in January 2007 to four second level appeals for grievances filed by Marino prior to December 6, 2006, and

4

Marino did not appeal to the second level the other grievances filed during this time. (Merrill Aff. & Ex. 1.) One of the four second level grievances was regarding the incident on September 26, 2006; one was regarding medical staff and the medical department; and two were regarding the grievance procedure. (Id.) In all, Merrill responded to eighteen second level grievance appeals filed by Marino during his incarceration. (Resp. SAMF ¶ 18; Merrill Aff. & Ex. 1.) The grievances included complaints regarding medical treatment and staff; mental health treatment and staff; mail room policy and staff; numerous corrections officers and prison staff; and the grievance process. Merrill responded to these grievance appeals on December 19, 2006, and dates after. (Merrill Aff. & Ex. 1.) The conversation between Merrill and Marino on December 6, 2006, was about the resolution of the September 26, 2006, incident. (Resp. SAMF ¶ 20; Merrill Aff. ¶ 21; Costigan Aff. ¶ 16.) Merrill never found any information to corroborate Marino's allegation of retaliation. (Merrill Aff. ¶ 32.)

According to Prevot, at approximately 8:00 a.m. on December 7, 2006, Officer Tripp ordered Marino to clean his cell as he observed his cell to be in a state of disarray. (SMF ¶ 12; Tripp Aff. ¶ 5.) Marino refused to clean his cell and became verbally abusive towards Officer Tripp. (SMF ¶ 13; Tripp Aff. ¶ 6; Resp. SAMF ¶ 24.) Because of Marino's failure to comply with the order, Officer Tripp restricted Marino to his cell. (SMF ¶ 14; Tripp Aff. ¶ 7; Resp. SMF ¶ 14; Letter to Merrill at 2; Resp. SAMF ¶ 23.)[3] Marino continued to be disruptive, making demands and banging on his cell door. (SMF ¶ 15; Tripp Aff. ¶ 8.)[4]

Marino responds that at the time of these interactions with Officer Tripp, he was conducting legal work and had papers out to do so. (Resp. SMF ¶ 12; Letter to Merrill at 2, Doc.

---

[3] The record citations do not support Marino's assertion that he was locked in the cell because of his panic attack not because of his refusal to comply with orders.
[4] Marino attempts to qualify this statement (Resp. SMF ¶ 15) but his record citations do not support his assertion that his disruptive behavior at this juncture was a consequence of his anxiety attack.

5

No. 99-3.[5]) Marino states that he and Officer Tripp were arguing about whether Marino takes his meals in the pod or in the dining hall. (Resp. SMF ¶ 13; Letter to Merrill at 2; SAMF ¶ 21; Letter to Riley at 3.)[6] Marino complained of an anxiety attack and hyperventilating after being locked in his cell without breakfast. (Resp. SMF ¶ 13; Letter to Merrill at 2; Rubano Dec. 7, 2006, Report at 1, Doc. No. 102-2; SAMF ¶ 24.)

Marino was then taken to meet with Sergeant Allen. (SMF ¶¶ 16, 17; Resp. SMF ¶¶ 16, 17.) Sergeant Allen then ordered Marino to clean his cell. (SAMF ¶ 22; Resp. SAMF ¶ 22.) Marino was then returned to his cell. (SMF ¶ 18; Resp. SMF ¶ 18.) Officer Tripp again ordered Marino to clean his cell and he again refused and used profanity. (SMF ¶ 19; Tripp Aff. ¶ 11.)[7]

Because of Marino's behavior and his inability to comply with the minimal requirements for orderly management, a decision was made by Dr. Maureen Rubano, to move Marino to the A-2 pod of the Mental Health Unit, which is the secure pod in the unit used to house disruptive inmates. (SMF ¶ 20; Rubano Aff. ¶ 20; Tripp Aff. ¶ 12.) Prior to the move, Marino was assessed by Rick Liberty, R.N. as Marino was becoming increasingly agitated and difficult. (SMF ¶ 21; Prevot Aff. Ex. 1, Doc. No.84-6.; Tripp Aff. ¶ 13; Rubano Aff. ¶ 21; SAMF ¶ 25; Resp. SAMF ¶ 25.)[8] Nurse Liberty informed Dr. Rubano that Marino was medically stable and informed Marino that if he needed any further medical attention, the medical staff would be available. (SMF ¶ 22; Resp. SMF ¶ 22.) Rubano informed Marino of her decision to place him

---

[5] Apparently this letter is dated December 19, 2006, but it is impossible to verify this due to the overlay of the ECF header. I am a little confused why counsel chose to rely on this document in support of factual statements pertaining to what Marino was doing at the time rather than affidavit statements or deposition testimony. For the purposes of slogging through the record I assume that Marino could testify at a trial to the factual representations made in the various letters penned by him to MSP officials.

[6] Marino relies on a report by Dr. Rubano to establish this proposition and this is clearly hearsay. (Rubano Dec. 7, 2006, Report at 1,Doc. No.102-2.)

[7] I strike Marino's qualification of this statement. His attempt at perfunctorily cross-referencing earlier responsive statements does nothing to qualify this statement.

[8] Marino's qualification of Paragraphs 20 and 21 are stricken as page two of his letter to Warden Merrill does not support his qualification of these two statements.

on A-2 or sub-acute status. (SMF ¶ 23; Resp. SMF ¶ 23.) Marino became argumentative and used profanity. (SMF ¶ 24; Resp. SMF ¶ 24; SAMF ¶ 25; Resp. SAMF ¶ 25.) Officer Prevot and Officer Tripp were responsible for moving Marino from the A-1 pod to the A-2 pod. (SMF ¶ 25; Resp. SMF ¶ 25.) Officer Prevot and Officer Tripp placed Marino in soft restraints and escorted him to his cell in the A-2 pod. (SMF ¶ 26; Resp. SMF ¶ 26.) Dr. Maureen Rubano accompanied Officer Prevot and Officer Tripp during the move to A-2. (SMF ¶ 27; Resp. SMF ¶ 27.)

When they arrived at the A-2 cell, Officer Prevot and Officer Tripp brought Marino into the cell and Officer Tripp began to take the soft restraints off of Marino's legs as Officer Prevot held him. (SMF ¶ 28; Prevot Aff. Ex. 1; Tripp Aff. ¶ 18; Resp. SAMF ¶ 26.) Marino responds that he was ordered to kneel on the bed and look out the window of his cell and while Officer Tripp held him Officer Prevot slammed his head against the window sill one or two times while Marino was handcuffed and shackled. (Resp. SMF ¶ 28; SAMF ¶¶ 26, 27; Marino Aff, ¶ 45; Letter to Merrill at 2; Letter to Riley at 5, Doc. No. 99-2.)[9] Prevot adds that when Marino was told to look out the window he asked why he had to look out the window. (Resp. SAMF ¶26; Letter to Riley at 5; Letter to Merrill at 2.) Peter Grant, an inmate in Cell 202 heard two loud bangs followed by Marino yelling for them to stop. (SAMF ¶ 28; Resp. SAMF ¶ 28; Grant Aff. at 1, Doc. No. 97-5.)

Dr. Maureen Rubano remained just outside the cell signing the log book. (SMF ¶ 29; Resp. SMF ¶ 29.) According to Prevot, Marino became combative and struggled as Officer Tripp was taking the restraints off his legs and refused to face the wall as ordered by Officer Prevot. (SMF ¶ 30; Prevot Aff. Ex. 1; Tripp Aff. ¶ 19; Resp. SAMF ¶ 29.) Marino insists that

---

[9] In his affidavit statement Marino has inflated his initial reports of one or two times to two or three times. (Marino Apr. 2, 2010, Aff. ¶ 45.)

7

he did not resist or become argumentative. (Resp. SMF ¶ 30; Letter to Riley at 5; Letter to Merrill at 2; SAMF ¶ 29; Marino Aff. ¶ 49.)

According to Prevot, Marino was placed up against the wall after failing to comply with orders to stop struggling. (SMF ¶ 32; Prevot Aff. Ex. 1; Tripp Aff. ¶ 21.) Marino then began to bang his head against the cell window adjacent to the cell wall. (SMF ¶ 33; Prevot Aff. Ex. 1; Tripp Aff. ¶ 22.) Officer Prevot insists that he did not bang Marino's head into the window. (SMF ¶ 34; Prevot Aff. Ex. 1; Tripp Aff. ¶ 23.) Marino was then placed on the mattress and the soft restraints put back on. (SMF ¶ 35; Prevot Aff. Ex. 1; Tripp Aff. ¶ 24.) From her position outside the cell, Dr. Maureen Rubano heard Marino say, "I ain't fucking . . ." and the sounds of struggle from within the cell. (SMF ¶ 36; Rubano Aff. ¶ 29.) At this point, several officers came in to assist with the situation. (SMF ¶37; Resp. SMF ¶ 37.) Per Prevot, Marino continued to resist and be argumentative. (SMF ¶ 38; Prevot Aff. Ex. 1; Tripp Aff. ¶ 26; Rubano Aff. ¶ 35.) This can be a critical and dangerous situation as many officers have been injured while kneeling to remove the restraints off an inmate's legs. (SMF ¶ 31; Resp. SMF ¶ 31.)

Marino responds by stating that he was told while being escorted to segregation that he had resisted but insists that he never did. (Resp. SMF ¶ 32, 38; Marino Apr. 22, 2010, Aff. ¶¶ 44, 49; Gerrish Aff. at 2, Doc. No. 98-5; SAMF ¶ 30.) He states that he did not bang his head against the cell wall voluntarily but had it forcibly hit against the sill by Officer Prevot. (Resp. SMF ¶¶ 33, 34; Marino Apr. 22, 2010, Aff. ¶ 45; Letter to Merrill at2; Letter to Riley at 5.) Marino's soft restraints were never fully removed. (Resp. SMF ¶ 35; Grant Aff. at 1, Doc. No. 97-5.)

According to Prevot, Officers Tripp and Prevot with several officers brought Marino down to an area outside the Mental Health Unit, called "receiving." (SMF ¶ 39; Prevot Aff. Ex.

8

1; Tripp Aff. ¶ 27; Rubano Aff. ¶ 30.)[10]  Dr. Maureen Rubano accompanied the officers as they took Marino to the receiving area. (SMF ¶ 40; Resp. SMF ¶ 40.)  There was no visible injury to Marino's head at this time. (SMF ¶ 41; Resp. SMF ¶ 41.)  There is no dispute that he was ordered to remove all his clothing. (SAMF ¶ 30; Resp. SAMF ¶ 30.)

Although Prevot maintains that Marino never requested medical treatment for any type of head pain or injury (SMF ¶ 42; Tripp ¶ 29; Rubano Aff. ¶¶ 33-34), Marino responds that he reported to medical after the incident complaining of severe headaches and he received aspirin and "other medications" as a consequence of these complaints. (Resp. SMF ¶ 42; Marino Apr. 2, 2010, Aff. ¶¶ 46, 149).

Officer Tripp returned to the A-1 pod and Prevot remained with Marino in receiving with several other officers and Dr. Maureen Rubano. (SMF ¶ 43; Resp. SMF ¶ 43.)  Marino was met in receiving by Sergeant Allen and, according Prevot, continued being argumentative. (SMF ¶ 44; Rubano Aff. ¶ 36;  Prevot Aff. Ex. 1.)  Because Marino was combative with officers on the A-2 pod of the Mental Health Unit, Dr. Rubano made the decision that he should be removed from the Mental Health Unit. (SMF ¶ 45; Rubano Aff. ¶ 37.)  Marino insists that he was not combative on the A-2 pod of the mental health unit  and he was not argumentative while in receiving; he was questioning why he was being asked to remove all of his clothing and, in response, several (unidentified) officers stomped on him while he remained handcuffed, maced him, and then gave each other 'high-fives.' (Resp. SMF ¶¶  44, 45 ; Gerrish Aff. at 2-3[11]; Letter to Merrill at 5; Letter to Riley at 5; Grant Aff. at 1; SAMF ¶ 36.)

---

[10]  Marino responds that he was assaulted while he was being escorted down to receiving (Resp. SMF ¶ 39) but the citation to the Gerrish Affidavit does not support this denial.

[11]  Marino is relying on Gerrish's hearsay representation that Marino was saying to the officers that he did not understand why he would have to be naked in front of men. (Gerrish Aff. at 2.)

The officers ordered Marino to change into the regulation security smock as part of the transition. (SMF ¶ 46; Resp. SMF ¶ 46.) According to Prevot, Marino refused to put the security smock on and began to use profanity. (SMF ¶ 47; Rubano Aff. ¶ 39.) Marino reports that he laid down on the ground when order to do so and then asked why he was required to remove all his clothing. (Resp. SMF ¶ 47; Gerrish Aff. at 2[12]; Marino Aff. ¶50; SAMF ¶¶ 31, 32.) Marino does not dispute that he called the officers "sick fucks." (SMF ¶ 48; Resp. SMF ¶ 48; Resp. SAMF ¶ 31.)

Prevot states that Marino continued to resist, refused to put on the smock, and used profanity despite being told several times by Sergeant Allen to stop. (SMF ¶ 49; Rubano Aff. ¶¶ 39, 40; Resp. SAMF ¶32; Prevot Aff. Ex. 1.) The officers attempted to put the security smock on Marino and he resisted. (SMF ¶ 50; Rubano Aff. ¶ 39; Prevot Aff. Ex. 1; Resp. SAMF ¶ 32.) After repeated instruction by Sergeant Allen to stop, Marino continued to resist. (SMF ¶ 51; Rubano Aff. ¶ 42.) When Marino refused to stop after several orders to desist, Sergeant Allen applied chemical agents (pepper mace) to Marino and Marino stopped resisting. (SMF ¶ 52; Rubano Aff. ¶ 43; Prevot Aff. Ex. 1.) Per Marino, he lay on the ground as ordered and did not resist as the officers pulled his clothing off and stepped on his neck and stomped on his head while he remained handcuffed. (Resp. SMF ¶¶ 49-52; Marino Apr. 2, 2010, Aff. ¶ 49-52.) Gerrish Aff. at 2; SAMF ¶ 35.) A non-defendant officer shook Marino and said he was resisting. (SAMF 34; Marino Aff. ¶51.) [13]

Marino was taken to the medical department for treatment for chemical exposure only. (SMF ¶ 53; Resp. SMF ¶ 53.) Marino was treated for chemical exposure. (SMF ¶ 54; Resp.

---

[12] Again, Marino is relying on Gerrish's hearsay representation that Marino was saying to the officers that he did not understand why he would have to be naked in front of men. (Gerrish Aff. at 2.)

[13] Prevot denies this statement, apparently relying on the report filed by Officer Gerrish about his participation in the event that does not include this conduct. (Resp. SAMF ¶ 34; Grass Aff. Ex. 1 at 7.) I strike Statement of Additional Material Facts Paragraphs 37 and 28 on hearsay grounds.

10

SMF ¶ 54; Resp SAMF ¶ 39.) He was not treated for a laceration or bump on the head or for any other type of head injury. (SMF ¶ 55; Resp. SMF ¶ 55; Resp. SAMF ¶ 39.) Prevot maintains that Marino was returned to A-2 the same day (SMF ¶ 54), but Marino reports he was placed in segregation and denied access to mental health treatment. (Resp. SMF 54; Marino Apr. 2, 2010, Aff. ¶ 56.) Marino submitted a sick call to the Medical Department at the Maine State Prison on December 7, 2006, requesting someone from mental health to talk to and never requested medical treatment for an injury to the head. (SMF ¶ 56; Resp. SMF ¶ 56.) Nevertheless, Marino insists that he suffered severe pain as a result of this incident which he reported to medical and mental health counselors. (SAMF 39; Marino Aff. ¶¶53, 54.)

In Dr. Maureen Rubano's professional opinion, this incident was the result of Marino's anger at having to clean his cell and his refusal to comply with the necessary routines of the Mental Health Unit. (SMF ¶ 57; Resp. SMF ¶ 57.) In Dr. Maureen Rubano's professional opinion, Marino became enraged by any requirement placed on him and construed every legitimate exercise of institutional control as a personal insult and a subject of litigation. (SMF ¶ 58; Resp. SMF ¶ 58.) Although Dr. Maureen Rubano represents that she never observed any staff at the Maine State Prison abuse or harass Marino (SMF ¶ 59; Rubano Aff. ¶ 5), Marino counters that Kathryn Gerrish reports that she witnessed the officer's mistreatment of Marino along side Dr. Rubano and Dr. Rubano would not intervene when asked by Gerrish to do so. (Resp. SMF ¶ 59; Gerrish Aff. at 2).

According to Marino, a prison officer recorded this incident with a hand held camera. (SAMF ¶ 33; Kathryn Gerrish Aff. at 2.) Citing the use of force report in its entirety, Prevot denies this on the grounds that there was no report by an officer recording the incident or any mention by others involved that there was such a recording. (Resp. SAMF ¶ 33; Grass Suppl.

Aff. Ex. 1.) Marino's attorney in this action requested a copy of any and all videos regarding the alleged incidents from the defendants through discovery and was only provided with two videos neither of which depicts the above-referenced incidents. (SAMF ¶ 62; Resp. SAMF ¶ 62.) Former Officer at the Maine State Prison, Ira Scherr, stated that the prison has a history of destroying documents and evidence in disciplinary cases involving investigation into employee conduct. (SAMF ¶ 63; Scherr Apr. 22, 2010, Aff. ¶ 15; Resp. SAMF ¶ 63.) [14]

Marino's designated expert stated that he believed Marino suffers from post-traumatic stress disorder as a direct result of the actions of Sergeant James E. O'Farrell and Jeffrey King (on September 26, 2006). (SMF ¶ 71; Resp. SMF ¶ 71.)[15] Marino's expert does not reference Mr. Prevot or the alleged incident on December 7, 2006. (SMF ¶ 72; Resp. SMF ¶ 72.) According to Marino, he suffers, as a direct result of these incidents, genital pain, migraine headaches, severe skin issues due to numerous applications of mace, stomach problems related to ulcers as well as constipation as a result of stress, and severe heart pain and panic attacks five to ten times a day due to Post Traumatic Stress Disorder. (SAMF ¶ 57; Marino Aff. ¶¶ 140-147.) Prevot responds that Marino has not provided an expert witness designation for a medical professional who would be competent to testify to the alleged aggravation of Marino's condition. (Resp. SAMF ¶ 57; Hallisey-Swift Aff. ¶ 4.)

---

[14] Marino argues that it should be noted that a number of the incidents he complains of were recorded on camera but the footage has been "destroyed and is no longer available." (Resp. Mem. Prevot Mot. Summ. J. at 9. n. 5.) Marino invites the court to infer that the contents of videos would have been favorable to his claim. (Id.) This argument really only adheres to the conduct of the officers described in the affidavit of Kathryn Gerrish apropos the efforts to get Marino into a security smock. However, Marino has not generated any evidence about Prevot's role in this transfer process from which I can infer anything about what the video would depict vis-à-vis Prevot's conduct in particular. This is a little mystifying because supposedly Marino has first-hand knowledge of what the video would have shown. In his April 2010 affidavit Marino describes how he was put in handcuffs and maced but only identifies specifically another officer who is not a defendant as shaking him and telling him that he was resisting. (Marino April 2, 2010, Aff ¶¶ 50-52.) He only mentions Prevot as follows: "Officers Tripp and Prevot caused this physical abuse to occur[] and did nothing to intervene to stop it." (Id. ¶ 55.)

[15] Marino qualifies this statement but the qualification is not relevant to this defendant's liability.

12

Marino filed forty-one grievances. (SMF ¶ 73; Resp. SMF ¶ 73.) Marino wrote detailed letters concerning the incidents which took place on December 7, 2006, to both Deputy Warden Riley on December 13, 2006, and to Warden Merrill on December 19, 2006. (SAMF ¶ 40; Resp. SAMF ¶ 40.) In January 2007, Commissioner Magnusson signed the response to Marino's third level grievance appeal regarding the September 26, 2006, incident denying Marino's grievance. (SAMF ¶ 41; Resp. SAMF ¶ 41.) Commissioner Magnusson was responsible for signing Marino's third level grievance appeals and the Commissioner received numerous third level grievance appeals. (SAMF ¶ 42; Resp. SAMF ¶42; Magnusson Aff. ¶¶ 17-18.) Marino wrote an additional letter to Warden Merrill on April 18, 2007, describing the September 26, 2006, incident and the alleged retaliation which followed. (SAMF ¶ 43; Resp. SAMF ¶ 43; Merrill Aff. ¶ 30.)

According to Marino, after December 7, 2006, many of Marino's grievances were not processed or officers refused to sign them. (SAMF ¶ 45; Marino Affidavit ¶¶ 61-62.) Prevot reiterates that Marino filed a total of thirty-six grievances after December 7, 2006, and that his grievances were accepted unless they did not comply with the grievance policy requiring an attempt at informal resolution or filing within a specific time frame. (Resp. SAMF ¶ 45; Costigan Aff. ¶ 6.) On August 5, 2007, Marino wrote a letter to Commissioner Magnusson detailing incidents of retaliatory conduct on behalf of prison guards towards Marino and also of the abuses of the grievance process. (SAMF ¶ 50; Resp SAMF ¶ 50.)

Ira Scherr was a correctional officer from August 2003 to July 2008 and was a union representative for most of that time including being the President of the Correctional Officers Union. (SAMF ¶ 55; Scherr Jan. 6, 2010 Aff. at 1.) Ira Scherr reported a corporate culture of corruption, harassment, and retaliation <u>against</u> correctional officers by all levels of

13

administration at the Maine State Prison to Commissioner Magnusson. (SAMF ¶ 56; Scherr Apr. 22, 2010, Aff. ¶¶ 4- 14; Resp. SAMF ¶ 56) (emphasis added).

Prevot maintains that Marino never filed notices of tort claim with the Office of the Attorney General for the alleged incidents on December 6, 2007, or April 7, 2007. (SMF ¶ 70; Sproul Aff. ¶ 3.) Marino retorts that during his time in segregation he sent numerous notices of claims to the Attorney General of all the incidents. He says he sent them in the mail and gave them to officers to mail. (Resp. SMF ¶ 70; Marino Apr. 2, 2010, Aff. ¶ 95.)

**Analysis**

### Constitutional Claim[16]

Prevot maintains that Marino was being self-destructive on December 7, 2006, and that the force he used was necessary to control Marino and was not applied to inflict pain. Prevot also maintains that the force used was de minimus. With respect to this latter argument, the United States Supreme Court in Wilkins v. Gaddy, __ U.S. __, __, 130 S.Ct. 1175, 1178 - 1180 (2010) this term explained that "the 'core judicial inquiry'" is not "the extent of the injury" but "the nature of the force -- specifically, whether it was nontrivial and 'was applied ... maliciously and sadistically to cause harm.'" Id. at 1179 (quoting Hudson, 503 U.S. at 7). The most damning evidence against Prevot is the claim that he slammed Marino's head into the window sill while he and Tripp were attempting to remove the soft restraints. However, when the evidence is viewed in its totality, and crediting that there is a factual dispute between Prevot and Marino regarding Marino's head's contact with the window sill, whatever occurred during the process of removing the soft restraints cannot be described as the sadistic and malicious infliction of harm. It would be one thing for a corrections officer to enter an inmate's cell and

---

[16] The parties agree that the disposition of a 42 U.S.C. § 1983 claim also controls a claim under the Maine Civil Rights Act. See Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007).

slam his head against the window sill because the inmate had spoken out of turn or otherwise irritated the officer. It is quite another thing for a corrections officer to be in a situation which clearly required the application of some physical contact, the transfer of an admittedly agitated prisoner from one unit to another, to have used force inappropriately, but not so as to cause any serious injury, in order to accomplish the legitimate objective of the prison staff. If I credit Marino's version of the events, which must be done at this juncture, it is still abundantly clear that this incident did not arise because of Prevot's intentional infliction of punishment or harm upon Marino.

With regards to the events in receiving when the officers were involved in carrying out the transfer ordered by Dr. Rubano, Marino has failed to create a dispute of fact as to Prevot's involvement in the acts complained of as an unconstitutional application of force. This action was not instigated by Prevot in order to punish or humiliate Marino. In his affidavit statement Marino complains that Prevot failed to intervene during the disrobing process. (Marino Apr. 2, 2010 Aff. ¶ 55) but his complaint articulates no such theory of liability for failure to intervene. See Calvi v. Knox County, 470 F.3d 422 (1st Cir. 2006) ; Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir. 1990). Failure to intervene is not the same as suggesting that Prevot unconstitutionally applied force during this portion of the events. The evidence clearly suggests that Marino was agitated by the transfer; the officers, collectively, may have done little to calm the troubled waters, but that does not amount to a failure to intervene claim against Prevot.

I do agree with Prevot that there is no factual basis for an independent retaliation or conspiracy claim apropos this defendant. The evidence in this summary judgment record does not support a conclusion that Prevot's actions were in any way done in retaliation for what

15

happened in regard to the earlier incident involving Sergeant O'Farrell. Once more all Marino has offered is conclusory generalizations about retaliation and conspiracy and no record evidence to support his claims.

**State Tort Claims**

Marino does not and cannot contest that a notice of claim -- a requisite for proceeding under the Maine Tort Claims Act -- has never been filed with respect to this December 7, 2006, incident. See 14 M. R. S. § 8107(1). The only notice of claim filed by Marino pertains to an incident on September 26, 2006, and Regis Prevot had no involvement in that incident. Beyond asserting that 'substantial notice was provided' due to his grievances and letters, Marino has not attempted to make any credible good cause showing[17] for his failure to file this mandatory notice for this December 7, 2006, incident. See Smith v. Voisine, 650 A.2d 1350, 1352 -53 (Me. 1994).

*Conclusion*

For these reasons I recommend that the Court grant Regis Prevot summary judgment on the constitutional claim and grant him judgment on the two state law counts as well.

NOTICE

> A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

---

[17] I say credible because Marino does state in a conclusory way that he sent numerous notices of claims. However, he filed his notice of claim on the September 26, 2006, incident and this was received by the Department of Corrections on March 21, 2007. This timely filing following within a few months of this event, belies Marino's contention that he could not have accomplished a timely filing for this event and certainly the onus is on Marino to provide concrete information to support his good cause argument beyond his own protestations that he tried, unsupported by any other record evidence.

16

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 30, 2010.