UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TINO MARINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 8-326-B-S |
| | ) | |
| COMMISSIONER, MAINE DEPARTMENT OF CORRECTIONS, et al., | ) ) ) | |
| | ) | |
| Defendants | ) ) | |

**RECOMMENDED DECISION ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT
NOVA HIRSCH (Doc. No. 87)**

Tino Marino, who is proceeding on a third amended complaint, is suing nine defendants for his alleged mistreatment when he was[1] an inmate at the Maine State Prison. Herein I address a hybrid motion to dismiss/motion for summary judgment filed by Officer Nova Hirsch who was directly involved in a key event at the prison on September 26, 2006, which is the subject of Marino's complaint against Hirsch. On the evening in question Marino got in disciplinary trouble when he began talking to another inmate who was "locked in," thereby infringing prison rules. In response to an order by Officer Hirsch, the officer on duty in Marino's unit that night, restricting Marino to his cell for refusing to stop talking with this inmate (a practice called 'tagging'), Marino expressed his incredulity and Marino grabbed his genitals with both hands as he walked towards his cell. This conduct led Hirsch to order Marino to see the sergeant on duty, former Sergeant James O'Farrell, Jr. There is no dispute, that as a consequence of the meeting with Sergeant O'Farrell, Officer Jeffery King ("the rover" for the unit), and Hirsch, Marino was ordered by Sergeant O'Farrell to walk back to his cell holding his genitals, an order with which

---

[1] According to a recent affidavit submitted by Marino's attorney, Marino is currently living in Lubec, Maine. (Campbell May 24, 2010, Aff. ¶ 2, Doc. No. 139-2.)

Marino complied while being escorted by Officers King and Hirsch and Sergeant O'Farrell. Based on the summary judgment record below and for the reasons that follow, I recommend that the Court grant summary judgment in favor of Officer Nova Hirsch on the three counts of Marino's complaint.[2]

## DISCUSSION

**Summary Judgment Standard**

"The judgment sought" by Nova Hirsch, "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). The purpose of summary judgment "'is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995) (quoting Wynne v. Tufts Univ. School Med., 976 F.2d 792, 794 (1st Cir. 1992).) "A Rule 56 motion may well end the case unless the party opposing it demonstrates the existence of a trialworthy issue as to some material fact." Id.

**Summary Judgment Facts**

Nova Hirsch is currently a correctional officer at the Maine State Prison. (SMF ¶ 1; Resp. SMF ¶ 1.) Officer Hirsch has worked at the Maine State Prison as a correctional officer since March 2006. (SMF ¶ 2; Resp. SMF ¶ 2; see also SAMF 1; Resp. SAMF ¶1.) Officer Hirsch was working as a correctional officer on the date of the incident alleged in the complaint on September 26, 2006. (SMF ¶ 3; Resp. SMF ¶ 3.) Hirsch had been a correctional officer for approximately six months at

---

[2] It may be that this defendant is entitled to dismissal based on the complaint allegations against her. However, as with the other six defendants who have also filed hybrid motions, I elect to proceed with the summary judgment analysis in the interest of definitively determining as to all the defendants -- in one round of recommended decisions and objections -- if there are any claims that deserve proceeding to trial. Defendants O'Farrell, Jr. and King have moved for summary judgment only, King having unsuccessfully moved for dismissal earlier in this action and O'Farrell apparently recognizing that such a motion would have been futile in his case.

the time of the alleged incident involving Marino on September 26, 2006. (SMF ¶ 4; Resp. SMF ¶ 4.) She was working as a housing officer in the medium unit on that day. (SMF ¶ 5; Resp. SMF ¶ 5.) As a housing officer, Hirsch was responsible for a pod of approximately fifty-six male inmates. (SMF ¶ 6; Resp. SMF ¶ 6.) Marino was housed in the medium unit on September 26, 2006. (SMF ¶ 7; Resp. SMF ¶ 7.) On this date, the pod was full of male inmates. (SMF ¶ 8; Resp. SMF ¶ 8.)

At approximately 8:00 p.m., Marino was outside of his cell and began talking to a fellow inmate who had been locked in his cell. (SMF ¶ 9; Resp. SMF ¶ 9.) It is a violation of the rules of the Maine State Prison to talk to an inmate who has been locked in his cell. (SMF ¶ 10; Resp. SMF ¶ 10.)[3] Officer Hirsch ordered Marino to stop talking to this inmate twice but Marino failed to comply with this order and continued talking with the other inmate. (SMF ¶ 11; Hirsch Dep. at 11:13 - 14; Hirsch Dep. Ex. 1 at 1; SAMF ¶ 8; Resp. SAMF ¶ 8.)[4] Because of Marino's failure to comply, Officer Hirsch tagged Marino in, or restricted him to his cell. (SMF ¶ 12; Resp. SMF ¶ 12.) Hirsch ordered Marino to return to his cell. (SMF ¶ 13; Resp. SMF ¶ 13.) Marino responded by stating, "You serious, for what?" (SMF ¶ 14; Resp. SMF ¶ 14.) When Officer Hirsch responded that he was being tagged in for talking to an inmate who was locked in, the plaintiff responded, "Whatever." (SMF ¶ 15; Resp. SMF ¶ 15.) Marino turned to walk to his cell. (SMF ¶ 16; Resp. SMF ¶ 16.) At this point, Marino grabbed his genitals with both hands as he walked. (SMF ¶ 17; Resp. SMF ¶ 17.)

According to Hirsch this gesture was done when Mr. Marino was outside of his cell and could clearly be seen by Officer Hirsch and other prisoners. (SMF ¶ 18; Hirsch Dep. at 9: 19 -20; Marino Dep. at 43:19 -20.) Marino notes that according to fellow inmate Qualey, Qualey was laughing at Marino for being locked in by Hirsch and that is when Marino grabbed his privates and told Qualey to "bite him." (Resp. SMF ¶ 18; Qualey Aff. at 2; SAMF ¶ 8; Resp. SAMF ¶ 8.) Officer

---

[3] Prior to the Marino incident on September 26, 2006, Officer Hirsch had a rule confrontation with inmate Louis Rodriguez who she had "locked in." (SAMF ¶ 7; Resp. SAMF ¶ 7.)
[4] Marino qualifies this statement by citing the Martin Qualey Affidavit. (Resp. SMF ¶ 11; Qualey Aff. at 2, Doc. No. 121-5.) Qualey witnessed this part of the night's interactions. However, the affidavit states, "Hirsch told Tino to lockin." (Qualey Aff. at 3.) I do not read this as a clear assertion that Hirsch only gave this directive once.

Hirsch believed that the gesture was directed at her based on what she saw. (SMF ¶ 19; Hirsch Dep. at 11: 7 -16; Marino Dep. at 43:21 -23; SAMF ¶ 2; Resp. SAMF ¶ 3.)[5] Hirsch did not know if Marino had said anything to another inmate at the time he was grabbing his crotch. (SAMF ¶4; Resp. SAMF ¶ 4.) Officer Hirsch stated to inmate Marino that this was sexual harassment. (SMF ¶ 20; Resp. SMF ¶ 20.)

Because of this action, Officer Hirsch then ordered Marino to see the sergeant on duty. (SMF ¶ 21; Hirsch Dep. at 32: 13 - 17; Ex. 1 at 1-2.) Marino walked out of the pod. (Resp. SMF ¶ 21; Fowles Investigation at 21, Doc. No. 97-3.)[6] The sergeant on duty was former Sergeant James E. O'Farrell. (SMF ¶ 22; Resp. SMF ¶ 22.) Sergeant James E. O'Farrell was Officer Hirsch's immediate supervisor on September 26, 2006. (SMF ¶ 23; Resp. SMF ¶ 23.) Former Sergeant James E. O'Farrell is Deputy Warden O'Farrell's son. (SMF ¶ 24; Resp. SMF ¶ 24.) Officer Hirsch expected that Marino would be reprimanded by Sergeant O'Farrell for the gesture he made to her. (SMF ¶ 25; Resp. SMF ¶ 25.)

Sergeant O'Farrell's Office was located in the hallway outside of the pod area. (SMF ¶ 26; Resp. SMF ¶ 26.) Marino walked down the hall to Sergeant's O'Farrell's office and waited on a bench outside of the door to the office. (SMF ¶ 27; Resp. SMF ¶ 27.) Officer Hirsch was then called to Sergeant O'Farrell's office. (SMF ¶ 28; Resp. SMF ¶ 28.) Officer Hirsch went into Sergeant O'Farrell's office and explained to him Marino's actions in the pod and the gesture he had made. (SMF ¶ 29; Resp. SMF ¶ 29.) Also in the office was Officer Jeffrey King who was working as a

---

[5] I strike Marino's response to Hirsch's Statement of Material Fact Paragraph19. Counsel should know better than attempt to use a portion of a third party's affidavit speculating on Hirsch's state of mind. For a similar reason I strike Marino's Statement of Additional Fact Paragraph 6. With regards to that statement, it is immaterial what this inmate knew about how many times Hirsch had been in this particular pod and this inmate cannot testify to Hirsch's mental stability. For the same reason, I also strike Statement of Additional Fact Paragraph 10 which is this inmate's description of Marino becoming "weird" after the incident which seems to be an effort to demonstrate the level of trauma the incident caused.

[6] Marino states that he either ignored or failed to hear Hirsch's order but this in not supported by the record citation (and it is rather beside the point because Marino ended up where he was ordered to be). (See SMF ¶ 27; Resp. SMF ¶ 27.)

4

"rover" in the medium unit that day. (SMF ¶ 30; Resp. SMF ¶ 30.) Sergeant O'Farrell wanted Officer King to be the main speaker of the event. (SAMF ¶12; Resp. SAMF ¶12; Hirsch Dep. at 12.)

Marino then went into the office with Sergeant O'Farrell, Officer King, and Officer Hirsch. (SMF ¶ 31; Resp. SMF ¶ 31.) Once Marino entered into defendant Seargent O'Farrell's office, the door was shut. (SAMF ¶ 13; Resp. SAMF ¶ 13.) At this point, Officer Hirsch observed Sergeant O'Farrell and Officer King order Marino to do various things, such as stand up, sit down, jump and turn around. (SMF ¶32; Resp. SMF ¶ 32.) Officer Hirsch observed Sergeant O'Farrell and Officer King conduct a "back and forth" with Marino with one ordering Marino to do one thing and the other ordering Marino to do another thing. (SMF ¶ 33; Resp. SMF ¶33.) Sergeant O'Farrell made statements to the effect that "I'm the one who can send you to seg. You listen to me." (SAMF ¶ 14; Resp. SAMF ¶ 14.)

According to Officer Hirsch she then observed Sergeant O'Farrell begin to question Marino about the incident in the medium unit. (SMF ¶ 34; Hirsch Dep. at 49:14 -50:8; Ex. 1 at 3-4.) Officer Hirsch observed Sergeant O'Farrell order Marino to do exactly what he did in the pod. (SMF ¶ 35; Hirsch Dep. at 50: 23 – 51: 1; Ex. 1, at 4.)[7] Marino grabbed his genitals as ordered. (SMF ¶ 36; Hirsch Dep. at 51: 12 - 14; Ex. 1 at 4.)

According to Hirsch, Sergeant O'Farrell then ordered Marino to walk back down the hall to his cell in the same manner and Marino walked to his cell holding his genitals. (SMF ¶¶ 37, 38; Hirsch Dep. at 52: 2 -11; Ex. 1 at 4) Marino asserts that all three officers "forced" him to hold his groin under threat of going to segregation for the rest of his life. (Resp. SMF ¶¶ 36, 37, 38; Marino Suppl. Aff. Apr. 2. 2001, ¶5, Doc. No. 100-1.)[8] Officer Hirsch, Officer King, and

---

[7] Marino's basis for denying this statement is nonsensical.
[8] In his Statement of Additional Fact Paragraph 9 Marino relies on Inmate Qualey's affidavit for an account of what happened as Marino was escorted back into his cell and that statement is stricken on hearsay grounds. (See SAMF ¶ 9; Resp. SAMF ¶ 9.) There is some controversy about Marino's two April 2, 2010, affidavits submitted in response to this round of dispositive motions. Although it is not determinative of the resolution of Hirsch's motion,

5

Sergeant O'Farrell returned with Marino to the pod and Sergeant O'Farrell signed the log book. (SMF ¶ 39; Resp. SMF ¶ 39.)

Officer Hirsch did not touch Marino at any point during the time in Sergeant O'Farrell's office. (SMF ¶ 40; Hirsch Dep. at 74:11 -12; Marino Dep. at 48: 24 – 49:2.) Marino 'denies' this statement by asserting that Hirsch did not touch Marino until, after one hour in the office, she grabbed one arm to escort Marino back to the pod. (Resp. SMF ¶ 4; ; Marino Suppl. Aff. Apr. 2. 2001, ¶¶ 5, 10.) There is no dispute that Officer Hirsch did not order Marino to do anything during the time in Sergeant O'Farrell's Office. (SMF ¶ 41; Resp. SMF ¶ 41.) Officer Hirsch felt "shock, chagrin and disappointment" during the incident. (SMF ¶ 42; Resp. SMF ¶ 42.)[9]

Hirsch wrote in a later report that after Marino was back in his cell,

> O'Farrell signed the log book. I think there were four of us standing behind the desk. We spoke, someone made a smart remark and we chuckled. I remember ducking my head and sucking into my cheeks because I felt it extremely unprofessional to be there laughing at anything at all considering the situation. The pod inmates could only have seen one thing, guards yuckin' it up on some sort of power trip after stickin' it to a prisoner. Terrible and horribly cliché, and nothing I ever want to be part of. My general feeling was I felt a bit sullied and soiled after it.

(Fowles Investigation at 23; SAMF ¶ 23; Resp. SAMF ¶ 23.)

According to Hirsch she felt "dazed" during the incident. (SMF ¶ 43; Hirsch Dep. at 52: 12-14; Ex. 1 at 4.) Marino counters that during the time in O'Farrell's office he began to cry because of the humiliation, pain, and embarrassment, and when he looked at Hirsch, he says, she was laughing at Marino. (Resp. SMF ¶ 43; Marino Suppl. Aff. Apr. 2. 2010, ¶ 3.)

Officer Hirsch had just gotten to the prison (six month prior to the incident) and did not have a big frame of reference. (SMF ¶ 44; Resp. SMF ¶ 44.) Officer Hirsch was never trained in the

---

I do note that Paragraph 5 of this supplemental motion is particularly suspect to criticism as a self-serving effort to resist summary judgment. See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4 -5 (1st Cir. 1994).

[9] Hirsch did not recall during her deposition taking Marino back to his cell with King and O'Farrell on September 26, 2006, following the incident in Sergeant O'Farrell's Office. (SAMF ¶¶ 21, 22; Resp. SAMF ¶¶ 21, 22.)

disciplinary methods that were used by Officer King and Sergeant O'Farrell during the September 26, 2006, incident with Marino (SMF ¶ 45; Hirsch Dep. at 70:24 – 71:4), although she was never trained <u>not</u> to do this (Resp. SMF ¶ 45; Hirsch Dep. at 41- 42). (<u>See</u> <u>also</u> SAMF ¶ 15; Resp. SAMF ¶ 15.) Officer Hirsch never observed any other correctional officers or sergeants at the Maine State Prison use this type of disciplinary method with inmates prior to September 26, 2006. (SMF ¶ 46; Resp. SMF ¶ 46.) The actions of Sergeant James O'Farrell on September 26, 2006, did not constitute a standard practice or policy for discipline at the Maine State Prison. (SMF ¶ 47; Resp. SMF ¶ 47.) Corrections officers are not trained in this method of discipline. (SMF ¶ 48; Resp. SMF ¶ 48.) Officer Hirsch has never observed any other correctional officer or sergeant at the Maine State Prison use this type of discipline since September 26, 2006. (SMF ¶ 49; Resp. SMF ¶ 49.)

Officer Hirsch indicates that she did not feel any reluctance to report the incident of September 26, 2006, because Sergeant O'Farrell was the son of Deputy Warden James E. O'Farrell. (SMF ¶ 50; Hirsch Dep. at 22:17 -20.) She did not have the sense that if she complained about Sergeant O'Farrell that there might be some consequences because his father was Deputy Warden. (SMF ¶ 51; Hirsch Dep. at 22:8 - 15.)[10]

Marino reported the incident to the advocate at the Maine State Prison, Anne Rourke. (SMF ¶ 52; Merrill Aff. ¶ 5.) Marino adds that his initial report was made to Melissa Cormier on September 27, 2006, and this clinician reported it to Rourke and encouraged Marino to see Rourke. (Resp. SMF ¶ 52.) There is no dispute as to the following. On or about October 5, 2006, Jeffrey Merrill, the Warden at the Maine State Prison received a memorandum from Anne Rourke, detailing the complaint by Marino regarding the incident alleged to have occurred on September 26, 2006.

---

[10] Marino attempts to counter these paragraphs. He points out that Hirsch reported during the investigation that her failure to write a report was confusing and weird to her. (Resp. SMF ¶ 50; Fowles Investigation at 24.) If you read the full paragraph in this report it does not actually support the inference that her confusion was somehow related to Sergeant O'Farrell's father's position at the prison. As for his denial of Paragraph 51, the cited deposition testimony does not support his assertion that Hirsch "did not have a sense of the consequences." (Resp. SMF ¶ 51.) A fair reading of this exchange was that she did not feel that there would be consequences because of the position of Sergeant O'Farrell's father at the prison. (Hirsch Dep. at 22.)

7

(SMF ¶ 53; Resp. SMF ¶ 53.) Based on this complaint, on October 12, 2006, Warden Merrill assigned the Unit Manager of the Close Unit, Dwight Fowles, to investigate the alleged incident on September 26, 2006. (SMF ¶ 54; Resp. SMF ¶ 54.) Dwight Fowles completed the investigation on October 25, 2006, and made recommendations based on this investigation. (SMF ¶ 55; Resp. SMF ¶ 55.) Sergeant James E. O'Farrell was placed on administrative leave on November 16, 2006. (SMF ¶ 56; Resp. SMF ¶ 56.) Based on this investigation and the subsequent recommendations, Sergeant James E. O'Farrell was then discharged from employment at the Maine State Prison on December 9, 2006. (SMF ¶ 57; Resp. SMF ¶ 57.) Officer Jeffrey King received a two-day suspension without pay with one day held in abeyance for ninety days. (SMF ¶ 58; Resp. SMF ¶ 58.) There was no disciplinary action taken against Officer Nova Hirsch. (SMF ¶ 59; Resp. SMF ¶ 59.)

Officer Hirsch did not write a report at the time of the incident September 26, 2006, as she felt that duty would fall to her supervisor or he would request that she write a report. (SMF ¶ 60; Resp. SMF ¶ 60.) Officer Hirsch was later contacted by Deputy Warden Riley regarding this incident as part of the investigation. (SMF ¶ 61; Resp. SMF ¶ 61.) Deputy Warden questioned Officer Hirsch about why she did not write a report. (SMF ¶ 62; Resp. SMF ¶ 62.) Officer Hirsch responded that she believed her supervisor was responsible for requesting a report. (SMF ¶ 63; Resp. SMF ¶ 63.) Officer Hirsch later wrote a report on October 24, 2006, as part of the investigation into the incident. (SMF ¶ 64; Resp. SMF ¶ 64; SAMF ¶¶ 5, 11; Resp. SAMF ¶¶ 5, 11.) Officer Hirsch understands now that she would be required to write a report in a situation such as the incident of September 26, 2006. (SMF ¶ 65; Resp. SMF ¶ 65.)

Officer Hirsch indicated in her seven-page report that she was concerned that Marino would hate her having seen him reduced to this. (SAMF ¶ 16; Resp. SAMF ¶ 16.) She stated that during Marino's incident in defendant Sergeant O'Farrell's office, that she..."felt certain thoughts or emotions which were shock, chagrin, and disappointment." (SAMF ¶ 17; Resp. SAMF ¶ 17.) Hirsch

8

made several statements during her deposition on January 13, 2010, that she didn't recall a detailed recollection beyond the Incident Report of October 24, 2006. (SAMF ¶ 18; Resp. SAMF ¶ 18.)

Officer Hirsch stated apropos one encounter she had with Marino after the September 26, 2006, incident that she came to the vague realization that Marino was "off somehow." (SAMF ¶19; Resp. SAMF ¶ 19.) To Hirsch Marino didn't "seem to comprehend things like in a line." It was almost like he did not hear what Hirsch was saying. She had to repeat things. "He had an idea of what was what and that was what he stuck with regardless of reality." (SAMF ¶ 20; Resp. SAMF ¶ 20.)

Marino's designated expert states that he believes Marino suffers from post-traumatic stress disorder as direct result of the actions of Sergeant James E. O'Farrell and Jeffrey King. (SMF ¶ 66; Resp. SMF ¶ 66.) Dr. Hooper did not include anything about Nova Hirsch in his report. (SMF ¶ 67; Resp. SMF ¶ 67.) Marino filed forty-one grievances. (SMF ¶ 68; Resp. SMF ¶ 68.) He felt it was okay to file grievances. (SMF ¶ 69; Resp. SMF ¶ 69.)[11]

*Analysis*

### Constitutional Claim[12]

In his memorandum responding to Hirsch's motion for summary judgment, Marino clarifies that his claim against Hirsch is limited to her involvement in the events of September 26, 2010,[13] and that his theory of recovery vis-à-vis his federal and state constitutional count is that he was subjected to sexual harassment amounting to cruel and unusual punishment under the Eighth Amendment standard and that he was unlawfully seized by Hirsch in contravention of the Fourth Amendment. (Resp. Mem. Hirsch Dispositive Mot. at 2-3.)[14] As to the latter theory he states: "The Fourth

---

[11] Marino's proposed qualification to this statement is rhetorical.
[12] The parties agree that the disposition of a 42 U.S.C. § 1983 claim also controls a claim under the Maine Civil Rights Act. See Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007).
[13] Later in his memorandum Marino forages into post-incident responses and efforts "to hide the fact of the conspiracy as much as possible." (Resp. Mem. Hirsch Dispositive Mot. at 11.)
[14] Marino concedes that this court can dismiss his official capacity claims against Hirsch. (Id. at 3.)

Amendment guards against unreasonable searches and seizures" and the sexual abuse and harassment "resulted in psychological torture and constituted 'an act of excessive force.'" (Id. at 3.) Faulting Hirsch for not addressing his Fourth Amendment claim, he asks, "Was the plaintiff's presence in defendant Sgt. O'Farrell's Office 'voluntary'?" and, "Was there a neutral limitation on the conduct of the individual officers?" (Id. at 4.)

First, with respect to this Fourth Amendment seizure theory Marino does cite the Fourth Amendment (and not the Eighth Amendment) in the first paragraph of his third amended complaint. (3d Am. Compl. ¶ 1.) In setting forth Count One he pled: "On September 26, 2006, Defendant Corrections Officer Sergeant James O'Farrell, Jr. along with Officers Jeffrey King, and Nova Hirsch sexually abused and assaulted Plaintiff by forcing the Plaintiff to grab his genitals in a provocation manner and to walk down the hall holding his genitals tightly so others including a female guard could see him." (Id. ¶ 9 (version 1)). In Paragraph 10 he alleged that this caused him "public humiliation by cruel and abusive actions amounting to psychological torture and use of excessive force in violation of the 4th, 8th, 14th Amendments to the United States Constitution and Article One, Sections 5,6, 6-A, 9 of the Constitution, State of Maine." (Id. ¶ 10 (version 1)). On its face these allegation do not state a Fourth Amendment involuntary seizure case and it is farfetched for Marino to argue that Hirsch was remiss in not recognizing such a claim against her.

Turning to the Eighth Amendment claim against Hirsch, the First Circuit summarized in Skinner v. Cunningham:

> The framework for analyzing such claims was set forth by the Supreme Court in Whitley v. Albers, 475 U.S. 312 (1986), and Hudson v. McMillian, 503 U.S. 1 (1992). Generally speaking, "[a]fter incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Whitley, 475 U.S. at 319 (internal quotation marks omitted). The critical question in such a case is whether the force was applied "maliciously and sadistically for the very purpose of causing harm," id. at 320-21, rather than "in a good-faith effort to maintain or restore discipline." Hudson, 503 U.S. at 7.

430 F.3d 483, 488 (1st Cir.2005).

With respect to an Eighth Amendment excessive force claim and this summary judgment record the most that Marino has attempted to do is to assert – through blatant hearsay – that Sergeant O'Farrell pushed him into the wall several times. (SAMF ¶ 9.) I have stricken this additional statement of fact because it relies solely on the affidavit of an inmate named Qualey who did not witness the alleged conduct but is relaying only what Marino told him.

This leaves only the Eighth Amendment claim of cruel and unusual punishment due to the humiliation of Marino in being forced to walk back to his cell grasping his genitals. Judge Carter observed in Collins v. Graham:

> "[B]ecause the sexual harassment or abuse of an inmate by a corrections officer can never serve a legitimate penological purpose and may well result in severe physical and psychological harm, such abuse can, in certain circumstances, constitute the 'unnecessary and wanton infliction of pain' " that is forbidden by the Eighth Amendment. Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir.1997) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)) (internal quotation marks omitted).

377 F.Supp.2d 241, 243 (D. Me. 2005).

The Second Circuit concluded in Boddie v. Schnieder that "isolated episodes of harassment and touching … are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court." 105 F.3d 857, 861 -62 (2d Cir. 1997) (citing Farmer v. Brennan, 511 U.S. 825, 833-34 (1994) and Rhodes v. Chapman, 452 U.S. 337, 348-349 & 348 n. 13 (1981)). There may be fact patterns in which this court could concluded that sexual harassment is sufficient to constitute an Eighth Amendment violation. However, most of the recent cases I have identified have concluded that one incident of non-violent harassment alone was not sufficient to meet the cruel and unusual punishment standard. See Silvagnoli v. Fischer, No. 9:07-CV-561 (NAM/GJD), 2010 WL 1063849, 14 (N.D.N.Y. Mar. 1, 2010) ("In this case, plaintiff alleges one

11

instance in which defendant Neafach allegedly massaged his shoulders and "tried" to grab plaintiff's groin area. Pursuant to the analysis in Boddie this one incident, even if true, cannot form the basis for an Eighth Amendment violation. The alleged conduct in this case does not even rise to the severity of the conduct alleged in Boddie. Thus, any Eighth Amendment claim for sexual abuse against defendant Neafach may be dismissed."); White v. Bergenstock, No. 9:08-CV-717 (FJS/DRH), 2009 WL 4544390, 4 (N.D.N.Y. 2009) ("Here, White alleges at most a single, verbal, isolated statement in May 2007 in which Bergenstock told White to display his penis if White wished additional food. Compl. ¶ 36. If true, such a statement would, of course, be indefensible of itself. However, there is no evidence of physical contact, touching, or force."); see also Marino v. Comm'n Me. Dep't Corr,, Civ. No. 08-326-B-S, 2009 WL 1150104 (D. Me. Apr. 28, 2009) (recommended decision on Officer King's motion to dismiss). In Collins the plaintiff's sexual harassment claim included "three factual allegations: (1) statements made to him about sexual acts; (2) an attempt to grab him in a sexual manner; and (3) exposure to a correction officer's genitalia." 377 F. Supp. 2d at 243. With respect to the attempt to grab allegation Judge Carter concluded:

> It is well established that not even "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson v. McMillian, 503 U.S. 1, 9 (1992); see also Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (inmate's allegations of excessive physical force-that he was bumped, grabbed, elbowed, and pushed-do not support an Eighth Amendment claim). Because not every physical touching constitutes a constitutional violation, it follows that an attempted touching-with no accompanying allegation of pain or injury-cannot support a claim of constitutional injury. Consequently, Plaintiff's allegation against Defendant Greenwald cannot form the basis for a section 1983 claim.

Id. at 244.

It is undisputed in this record that Hirsch did not direct Marino to demonstrate what he did in the Pod to Sergeant O'Farrell or, herself, order him to march back to his cell holding his

12

genitals, the conduct that the Third Amended Complaint describes as "public humiliation by cruel and abusive actions amounting to psychological torture and use of excessive force." Hirsch had no supervisory responsibilities vis-à-vis Sergeant O'Farrell -- it was quite the reverse. Even assuming that this sexual harassment constitutes a constitutional violation based on the precedents cited above, Hirsch was not directly involved in inflicting this embarrassment or pain.

Turning to Hirsch's direct conduct during the incident, there is no record evidence that Hirsch even verbally harassed Marino and if there was it would not necessarily be actionable. See Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) ("It is clear that verbal abuse by a prison guard does not give rise to a cause of action under § 1983.") This leaves Marino with, at most, a claim that it was abusive within the meaning of the Eighth Amendment for Hirsch to laugh at him during his humiliation by other officers. However, it is clearly not an application of force within the meaning of the Eighth Amendment prohibition. See Collins, 277 F. Supp. 2d at 243-44. Furthermore, the only inference to be drawn from the facts of this case – particularly in view of the advancement of facts by Marino that Hirsch felt ashamed of her colleague's conduct and uncomfortable with expressing any humorous reaction – is that she was not motivated by a level of ill will towards Marino within the embrace of the Whitley v. Albers, 475 U.S. 312 (1986) and Hudson v. McMillian, 503 U.S. 1 (1992) malicious and sadistic standard.

Although the parties have not raised the concern, the United States Supreme Court in Wilkins v. Gaddy, __ U.S. __, __, 130 S.Ct. 1175, 1178 -1180 (2010) this term, walked away from those Circuit Courts of Appeal which found Eighth Amendment claims non-cognizable purely on the grounds that the level of injury was "de minimis." Id. at 1179 n. 2. Rather, "the 'core judicial inquiry'" is not "the extent of the injury" but "the nature of the force -- specifically, whether it was nontrivial and 'was applied ... maliciously and sadistically to cause

harm.'" Id. at 1179 (quoting Hudson, 503 U.S. at 7). I view momentarily laughing at a prisoner in a particular, nonrecurring situation as a form of punishment is easily categorizable as "trivial" even if motivated by ill will.

There is one last loose end necessary to tie up apropos Count One and this defendant. Marino does attempt to hold Hirsch accountable for her failure to intervene in the actions of Sergeant O'Farrell and Officer King. (Resp. Mem. Hirsch Mot. Summ. J. at 6.) See Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir. 1990). Marino cites to his grievance in which he states that he felt like Officers King and Hirsch,

> should have said something when [Sergeant O'Farrell] told me to grab my dick the only reason I did it was I thought that when anyone goes to Sergeants office they try to punk you out, but to tell someone to grab th[eir] dick they knew it was wrong so why did they just go along with it and assist him with punting me out. … I have never been disrespected like that before specially in front of a wom[a]n they should of said something and stopped him, not gone along with it, it is wrong and people shouldn't be degraded like that and for them to not say anything it makes me think this is how everyone gets treated.

(Mem. Resp. Hirsch Dispositive Mot. at 8; Doc. No. 88-12 at 15.) He further points to his assertion that Hirsch was laughing and chuckling at his plight. In a hyperbolic passage Marino opines,

> In the present case, Defendant Nova Hirsch dismisses the severity of the Plaintiff's grabbing himself "with the same people of his own accord" as a *de minimus* infraction, yet, insisted that the same act offended her as sexual harassment and sought retribution with the Sergeant. Simply because the Defendant Hirsch was "inexperienced" didn't prevent her from feeling "sullied and soiled", "an evil oil lay on my skin". Plaintiff's Exhibit # 4, Hirsch report to the Investigatory Panel.
> Would Nova Hirsch's "inexperience" have protected her if the Plaintiff had died during the "torture", and then, if she failed to say anything to anyone during the incident or attempt to prevent it or fail to report the incident until there was an investigation?

(Resp. Mem. Hirsch Dispositive Mot. at 13.)

It is Hirsch's contention that Calvi v. Knox County, 470 F.3d 422 (1st Cir. 2006) is solid ground to bar Marino for raising such a theory of liability in the summary judgment posture when he did not plead this in the operative third amended complaint. Calvi does support Hirsch's argument:

> In her opposition to the defendants' motions for summary judgment, Calvi for the first time asserted a … failure to intervene claims against McLaughlin and Gracie. None of these newly minted claims had been articulated, or even vaguely insinuated, in Calvi's complaint. The magistrate judge deemed the claims waived … and the district judge agreed.
> Calvi argues, in effect, that the Civil Rules require only notice pleading, and that notice of the incident subsumes within it notice of any and all claims arising out of the described nucleus of operative facts. The first part of her premise is correct; this court has held that there are no heightened pleading standards for civil rights cases and that, therefore, notice pleading rules apply to such actions. See Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 66-67 (1st Cir.2004). Thus, a plaintiff's complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 66 (citing Fed.R.Civ.P. 8(a)(2)).
> The second part of Calvi's premise is incorrect. Notice pleading rules do not relieve a plaintiff of responsibility for identifying the nature of her claim. See Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir.1988) (explaining that although the requirements of Rule 8(a)(2) are minimal, "minimal requirements are not tantamount to nonexistent requirements"). Consequently, the statement of claim must, at a bare minimum, "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Educadores, 367 F.3d at 66 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). This means that, in a civil rights action, as in any other civil action subject to notice pleading requirements, the statement of claim must "at least set forth minimal facts as to who did what to whom, when, where, and why." Id. at 68.
> ….
> …Her complaint named McLaughlin and Gracie as defendants but limned only claims of excessive force against them. Neither a duty to intervene nor a breach of that duty was alluded to in any way, shape, or form. Calvi's argument rests, therefore, on the proposition that a failure to intervene claim is implicit in an excessive force claim directed at multiple defendants. We reject that proposition.
> The short of it is that, as the district court held, Calvi was not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment. See Torres-Rios v. LPS Labs., Inc., 152 F.3d 11, 15-16 (1st Cir.1998).

470 F.3d at 431-32. Given the fact that we are working off a third amended complaint and all the water that has erratically drifted under the bridge to get to this series of dispositive motions,

15

this shift in theory cannot be treated as some minor inadvertent failure to fully articulate an independent theory of recovery. Rather than pleading what the facts of the case supported against Officer Hirsch, that she was not involved in the alleged application of excessive force, but was a bystander who had a duty to intervene, see Johnson v. Deloach, 692 F. Supp. 2d 1316, 4, 8 (M.D.Ala. 2010), Marino's approach to this litigation has been erratic and has come to naught as it concerns reaching the jury on question of the constitutional liability of Nova Hirsch.

**State Law Counts**

With respect to Marino's state law claims against Hirsch he again invokes a theory of liability that is dependent on her peripheral involvement, equating her to a get-away-driver in a robbery. (Resp. Mem. Hirsch Dispositive Mot. at 13.) With respect to his assault count the record is undisputed that the most contact Hirsch had with Marino was her taking his arm when he was being escorted back to his pod.

"To withstand a defendant's motion for summary judgment on a claim of intentional infliction of emotional distress," under Maine law," a plaintiff must present facts in support of each of the following four elements:"

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct;
> (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community";
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
> (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

Curtis v. Porter, 2001 ME 158, ¶ 10, 784 A.2d 18, 22 -23 (quoting Champagne v. Mid-Maine Med. Ctr.,1998 ME 87, ¶ 15, 711 A.2d 842, 847 in turn quoting Loe v. Town of Thomaston, 600 A.2d 1090, 1093 (Me.1991)) (footnote omitted). Curtis recognized that "a defendant may be liable for intentionally or recklessly inflicting emotional distress." 2001 ME 158, ¶ 10 n.9, 784

16

A.2d at 23 n.9. Marino's argument that Officer Hirsch could be held liable for the reckless infliction of emotional distress on the facts of this summary judgment record because she was akin to a getaway driver for a robbery does not pass the straight-face test in view of the undisputed record evidence (introduced by Marino) that Hirsh was stunned by the approach to disciplining Marino during the office encounter and the trip back to the pod.[15]

*Conclusion*

For these reasons I recommend that the Court grant Nova Hirsch judgment on all three counts of Marino's complaint.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 30, 2010.

---

[15] I further note that should the Court disagree with this conclusion as to either tort count, Hirsch would be entitled to consideration of whether or not she is absolutely immune pursuant to 14 M.R.S. § 8111 (1)(c). I discuss this issue at greater length in my recommendation on Jeffrey King's dispositive motion.